2001 UT 18

Mary TANNER, Plaintiff and Appellant,

v.

Lloyd CARTER, Howard Carter, and Steve Carter, Defendants and Appellees.

Shirl Graff, Trustee of the Emil J. Graff Revocable Trust and Michael O. Longley, Plaintiffs and Appellees,

v.

Steve Carter, Howard Carter, Lloyd Carter, Kristy Enterprises, Inc., a Utah Corporation, Doyle Sampson, and Security Title Company of Southern Utah, Defendants and Appellees,

and

Mary Tanner, Defendant and Appellant.

No. 981846.

Supreme Court of Utah.

Feb. 23, 2001.

Darwin C. Fisher, Provo, for plaintiff Tanner.

J. Craig Smith, David Hartvigsen, Clark R. Nielsen, Salt Lake City, for plaintiff Longley Ronald Read, Michael D. Hughes, St. George, for defendant Carter.

DURRANT, Justice:

¶ 1 Mary Tanner appeals certain portions of the district court's ruling, which quieted title to various water rights. Her action derives from a divorce settlement in which she was awarded one-half of the water rights held by her former husband, Lloyd Carter. At trial, Tanner alleged that she never received her share of water rights and that Lloyd, his brother Steve, and their father, Howard,[1] conspired to deprive her of water rights she had acquired by virtue of the divorce settlement. Michael Longley, the Hurricane Valley Mutual Water Company, and Shirl Graff, acting as trustee of the Emil J. Graff Revocable Trust (collectively, the "Longley plaintiffs") filed suit to protect their interests in the disputed rights. The cases were consolidated, and the court conducted a bench trial. Prior to trial, the parties stipulated that Tanner owned certain of the disputed water rights. At the conclusion of trial, the court quieted title in the remaining disputed water rights. Tanner contests multiple facets of the court's ruling. We affirm on most issues, but remand for entry of findings and rulings on two discrete points.

## BACKGROUND

¶ 2 On appeal from a bench trial, "[f]indings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a). We relate the facts accord-

---

1. To avoid confusion, we will generally refer to the various members of the Carter family by their first names.

ingly, granting due deference to the trial court's resolution of factual disputes.

¶ 3 Tanner was formerly married to Lloyd Carter. In April of 1980, Lloyd's brother Steve arranged to purchase Grassy Meadows Ranch from Emil J. Graff for an agreed purchase price of $1,116,000. This purchase was to include water rights that Graff also owned, but which were not yet perfected.[2] Graff's original water right was designated as application number 81–900. In a series of transactions occurring shortly before and after the 1980 agreement, this right was divided into four applications. The numbers of those applications were designated as: (1) 81–900, which included 515.56 acre-feet; (2) 81–1628, which included 559.98 acre-feet; (3) 81–1475, which included 425.94 acre-feet, and (4) 81–2158, which included 109.74 acre-feet. .

¶ 4 Steve's intent was to purchase the property, perfect the water rights, and then subdivide the land and water rights into smaller parcels and sell them at a profit. In furtherance of this plan, Steve incorporated a company known as Kristy Enterprises. Lloyd was not involved in the original transaction with Graff and had no interest in Kristy Enterprises at that time. Kristy Enterprises made a $150,000 down payment on the purchase price, with the balance to be paid over fifteen years and carried pursuant to a Trust Deed Note secured by the purchased ranch property itself. According to the purchase contract, Kristy Enterprises was obligated to perfect the rights to the water. To facilitate fulfillment of this obligation, Steve received a power of attorney from Graff, but did not receive title to the water, the rights for which were placed in escrow with a title company.

¶ 5 Thereafter, Kristy Enterprises began to contract with various third parties to sell parcels of land and water rights to go with the land. The water was not considered to be appurtenant to the specific parcels sold, but was to be drawn generally from the existing water rights and sold at a ratio of eighteen acre-feet per each twenty-acre par-

cel of land. One of the major third party purchasers was Michael Longley. Longley created a number of companies to facilitate development of the land he intended to buy. In the early 1980's, he and various partners and associates arranged to buy several sizeable tracts of Grassy Meadows.

¶ 6 In 1983, Kristy Enterprises began to suffer financial difficulties. Some buyers began making payments directly to Graff. A few of them received water deeds directly from Graff, but many never received their water. As Steve's difficulties in meeting Kristy Enterprises' financial obligations mounted, he turned to his brother Lloyd (who is a certified public accountant) for assistance. Lloyd performed a significant amount of work in the effort to save Kristy Enterprises and was promised an interest in the company's profits. In 1984, Kristy Enterprises executed a warranty deed designating Lloyd as the grantee. That deed conveyed a two-acre parcel and included a clause that purported to transfer to Lloyd any water rights that Kristy Enterprises then owned or would later acquire. For a time, Steve moved to Las Vegas, leaving management of Kristy Enterprises in Lloyd's hands.

¶ 7 In subsequent years, Lloyd was involved in a number of complicated transactions respecting Kristy Enterprises and third parties. Despite Lloyd's efforts, Kristy Enterprises continued to suffer financially and stopped paying taxes in 1986. The Utah Division of Corporations dissolved Kristy Enterprises the following year. Steve and Lloyd negotiated with Graff to avoid foreclosure on the original Trust Deed. They proposed returning the land that had not been resold or paid for, but also asked to keep some land in exchange for their sales efforts and their work in perfecting the water rights. Graff accepted a deed in lieu of foreclosure in 1987. The deed conveyed all land back to Graff, with the exception of various parcels already sold to third party bona fide purchasers, two twenty-acre parcels for Steve and Lloyd, and the two-acre parcel Kristy Enterprises had conveyed to Lloyd in 1984.

---

2. Perfection refers to the process by which an applicant for water rights demonstrates to the state engineer that the claimed rights are devoted to beneficial use and receives a certificate to that effect from the engineer. *See* Utah Code Ann. §§ 73–3–1 to –17 (1989 & Supp.2000).

¶ 8 The escrow on the remaining water rights was closed and the files were returned to Graff. Nevertheless, a number of third party purchasers had not yet received their water. In 1989, Longley began negotiations with Graff, with the intent of purchasing the remaining Grassy Meadow property and water rights. Also, during the first part of that year, Steve approached Graff and inquired about satisfying various water rights sold to third parties and the rights associated with the forty-two acres received by Lloyd.[3] Graff handed Steve the master deed for water right 81–1475. Steve turned the deed over to Lloyd.

¶ 9 In August of 1989, Lloyd and Tanner divorced. The decree incorporated the provisions of a stipulation between Lloyd and Tanner, which accorded her one-half of all water rights that Lloyd had acquired during their marriage and owned at the time of their divorce. The decree did not specify which water rights Lloyd in fact owned. In September of 1989, Lloyd delivered a quitclaim deed to Tanner, purporting to describe the various water rights she had obtained by virtue of the decree. However, the following day Lloyd called Tanner and informed her that the deed was inaccurate and asked her not to record it. Lloyd did not tell Tanner in what specific respects the deed was inaccurate, nor did he provide a corrected deed despite numerous requests that he do so. Fearing that Lloyd would sell some of the water rights without her knowledge, Tanner recorded the deed in February of 1990.

¶ 10 In April of 1990, Graff died. In June of that year, Steve delivered the deed to water right 81–1475 to his father, Howard. Steve testified that he did so because Lloyd had done nothing to satisfy the claims of the third party purchasers, and Steve did not have confidence that anything would be done in the future.

¶ 11 In May of 1991, Longley entered into an option agreement with the Emil Graff Revocable Trust to purchase the portions of water rights 81–900, 81–2158, and 81–1475,

and Grassy Meadows land remaining after the rights of bona fide purchasers were satisfied. In November of 1991, the Division of Water Rights determined that the 1984 warranty deed, in conjunction with Graff's 1989 transfer of water right 81–1475, had vested ownership of that right in Lloyd. In 1992, Steve and Lloyd recorded a correction deed. The correction deed purported to clarify the nature of the 1984 warranty deed as a mere hypothecation that was not to be interpreted either to defeat the rights of third party purchasers or to transfer any water rights for which Steve and Lloyd had not paid.

¶ 12 In 1993, Tanner received a box of documents from Lloyd's second wife. That box contained three deeds on which Lloyd had been listed as grantee, but his name had been whited out and Howard's name written in.

¶ 13 Tanner filed suit on June 6, 1994, seeking to quiet title in various water rights she alleged were in Lloyd's possession at the time of their divorce. On July 25, 1995, Shirl Graff, acting as Trustee of the Emil J. Graff Revocable Trust, and Michael Longley filed a separate suit to protect their interests in Grassy Meadows.[4] Subsequently, the district court entered an order in October of 1995 consolidating the two cases. The district court conducted an eight-day bench trial and rendered a verdict quieting title in the numerous water rights that had been implicated by the dozens of transactions undertaken by Steve, Lloyd, and Kristy Enterprises. The court issued its initial findings of fact and conclusions of law on April 17, 1998. It issued additional findings and conclusions on September 4, 1998, in response to a motion by Tanner. We relate only those holdings that are pertinent to the issues in this appeal.

¶ 14 With respect to the dispute over the master deed to water right 81–1475, the court held that the 1989 "transfer" from Emil Graff to Steve was subject to a constructive trust for the benefit of any third party bonafide purchasers who had not received the rights to water bought from Kristy Enter-

---

3. Steve had quitclaimed his twenty-acre parcel to Lloyd.

4. Hurricane Valley Mutual Water Company, one of the companies Longley created to develop his portions of Grassy Meadows, was added as a plaintiff by amended complaint on April 2, 1996.

prises, with any surplus reverting to Graff. The court also held that the original 1984 warranty deed, upon which Tanner based her claims that Lloyd had acquired title to the master deed to water right 81–1475, had not been intended to actually transfer any present or future interest in water rights, but had been given simply as a security interest to Lloyd. Based on these holdings, Lloyd never acquired any interest in the master deed and Tanner's claim failed.

¶ 15 The court also addressed numerous peripheral matters and third party transactions. Only a few of those holdings are pertinent to issues raised on appeal. First, with reference to a transaction or matter known as "Dixie Properties," the court found that "Lloyd Carter claims no interest in Dixie Properties and has abandoned any interest in water rights owned by Dixie Properties. Tanner has not proven that any such right exists."[5] Second, the court apparently made a single reference to what the parties now describe as the "Clever deed." The court simply stated that "[t]he evidence was insufficient to establish a conveyance from Clever." Finally, with respect to the whited-out deeds, the court found that Lloyd had in fact intended to transfer title to his father, Howard, and that the alteration of the deeds was evidence of that intent.

¶ 16 On appeal, Tanner only directly challenges this ruling with respect to one of the three whited-out deeds.[6] Among the many

transactions involving Lloyd and Steve, a third party, Wayne Cox, had apparently received a significant portion of the water associated with right number 81–1628. Cox then deeded 150 acre-feet of that water back to Lloyd in February 1986.[7] The deed originally bore Lloyd's name as grantee, but at some point Lloyd's name was whited out and Howard's name was typed in.

## ANALYSIS

 ¶ 17 Where an appellant challenges the court's findings, that appellant must "marshal all the evidence in support of the trial court's findings and then demonstrate that even viewing it in the light most favorable to the court below, the evidence is insufficient to support the findings." *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985). Where the appellant fails to so marshal the evidence, we need not consider the challenge to the sufficiency of the findings. *See id.* We review the trial court's rulings of law for correctness.[8] *See Averett v. Grange*, 909 P.2d 246, 248 (Utah 1995).

¶ 18 Tanner raises numerous issues in a scatter-shot fashion. Many of her challenges are directed at the district court's resolution of evidentiary conflicts, but she makes little or no attempt to marshal the evidence supporting its findings. Moreover, her brief is confusing and incomplete. Although she presents selected facts, those facts are poorly organized, and they do not provide the coher-

---

**5.** The court also held that "[n]o party is entitled to any water right connected with Dixie properties except as stipulated by [the] Carters." With reference to these exceptions, the court cited two conclusions in its original order, which simply set forth a series of water right numbers and acre-feet to which Tanner was entitled according to stipulation of the parties. We must therefore assume that Tanner's present claim on appeal goes beyond any of the rights specifically awarded to her in those paragraphs.

**6.** As noted above, Tanner discovered three deeds where Lloyd's name had been whited out. The other two are described in the briefs as the "Prisbrey deed" and the "Blake deed." These deeds are not otherwise clearly referenced in Tanner's argument, except apparently in relation to her claims that they provide evidence of a conspiracy by the Carters. The district court does not anywhere refer to a "Prisbrey" deed, but does mention that "Carter stipulated that

plaintiff Tanner should receive one-half of the 7 acre-feet of water related to Blake." Because we decide the conspiracy issue on other grounds, and Tanner has not otherwise raised any adequately supported argument with respect to the "Prisbrey deed" or the "Blake deed," we do not address them as independent issues in this case.

**7.** None of the briefs explain how Wayne Cox acquired valid title to this water, nor do they provide any record citations indicating how this court might discover that information. However, it appears undisputed that Cox owned the water at the time he deeded it to Lloyd.

**8.** The district court in this case has occasionally made findings of fact that are more accurately characterized as rulings of law, and vice versa. In this regard, we will review the findings and holdings according to their actual character, and not according to the label applied by the court.

ent background picture necessary to an understanding of her arguments. Indeed, her brief as a whole lacks clarity in designating which events and water rights are pertinent to the arguments made.

■ ¶ 19 Her approach to this case illustrates an all too common problem that merits our attention. Although we recognize that this is a complicated case, we must emphasize that such complexity demands even more attentiveness to presenting a clear picture of facts and argument to this court, which, of course, does not have the benefit of having previously reviewed the evidence. In particular, appellate advocates must never assume that it is this court's burden to comb the record for evidence supporting poorly framed arguments. We have stated this principle on multiple occasions. *See, e.g., MacKay v. Hardy,* 973 P.2d 941, 947–48 & n. 9 (Utah 1998); *Walker v. U.S. Gen., Inc.,* 916 P.2d 903, 908 (Utah 1996). With this concern in mind, we address each of Tanner's arguments in the order presented.

## I. THE DEED FROM WAYNE COX

¶ 20 Tanner first contests the court's disposition of 150 acre-feet deeded by Wayne Cox from water right 81–1628. The deed originally bore Lloyd's name as grantee, but Lloyd's name was whited out and Howard's name was typed in. The court did not specifically address the Cox deed, but did rule as follows with respect to the whited-out deeds generally:

> The "whited-out" deeds were evidence of legitimate transactions with Howard Carter and, at the time of the Tanner/Carter divorce, Lloyd Carter had no interest in the water described in those deeds which has not been accounted for herein.

¶ 21 The legal and factual basis for the court's ruling on this issue is unclear. The court did not enter any specific factual findings and the legal basis for its ruling is conclusory. Tanner asserts that, regardless of intent, title cannot legally be transferred by altering the grantee's name. The Carters assert that Tanner waived this legal argument by failing to present it to the district court for decision. While we understand the

burdens and difficulties with which the district court was confronted, we are unable to adequately address this issue on appeal without more specific findings and a statement of the legal basis for the resolution of the issue presented. We therefore remand this issue for entry of such findings and rulings.

## II. WATER HELD BY THE DIXIE PROPERTIES PARTNERSHIP

¶ 22 Tanner's second argument relates to a series of transactions concerning water rights associated with a partnership denominated by the title "Dixie Properties." There is very little information in the district court's findings and conclusions related to this transaction or the transactions pertaining to this argument. It appears the court's attention was not drawn to this question until Tanner moved for supplemental findings. The connection between Dixie Properties and the water rights discussed above is not entirely clear. Apparently, Steve originally held a one-quarter interest in the Dixie Properties partnership, which at one time held title to some of the water rights in dispute. Steve assigned his interest in the partnership to Lloyd.

¶ 23 Testimony was presented at trial that Dixie Properties had been dissolved and that the partners believed that all water rights not otherwise specifically transferred had been divided among them individually. Lloyd Carter had received a portion of the Dixie Properties water, of which he conceded Tanner was entitled to half, as well as half of another associated portion he had received directly from Steve. The State Engineer's Office showed that 53.114 acre-feet remained in the name of the partnership. Tanner now claims that Lloyd was entitled to one-quarter of the 53.114 acre-feet, and that the Carters stipulated at trial that she was therefore entitled to one-eighth of that amount.

¶ 24 Tanner's contention that the Carters stipulated at trial to Lloyd's ownership of one-quarter of the figure shown by the State Engineer's Office ignores the fact that any stipulation was, as the trial transcript makes clear, contingent. The original purported stipulation derives from a discussion between the district court and the Carters' attorney

at trial, Mr. Read, which transpired as follows:

THE COURT: You mean it was in Mr. Carter's name rather than in the name of Dixie Properties?

MR. READ: There was some in both, Your Honor. There was 14.659 acre-feet in Mr. Carter's name, and then there's—the Water Division is showing 53.114 acre-feet in Dixie Properties. We don't dispute that Lloyd Carter is entitled to a fourth of that, therefore, entitling Mary Alice Tanner to half of that. It's another one of those situations that there's more water there than we thought was retained by Dixie Properties, but if the Division of Water Rights' flowcharts are correct, it benefits both of them, so we have no problem of half of more than we thought we had.

Then, a short time later, during Tanner's testimony, the following conversation among the court and counsel took place:

THE COURT: Well, that was the one that had the Dixie Properties, and I think you said Mr. Carter has a one-quarter interest in that.

MR. FISHER [Tanner's attorney]: Correct.

THE COURT: So Ms. Tanner's interest would be an eighth essentially?

* * *

MR. FISHER: Right. And I think the only question they have is whether or not the Water Department has determined exactly—if they're correct as to the amount. They determined they have. We're just saying it is correct.

MR. READ: Our numbers, Your Honor, were lower than that. We have seen the Water Department's numbers showing 53 point something in there that she'd be entitled to an eighth—one-eighth of, but I believe our numbers prior to were right around 40 acre-feet, rather than 53. So there's an additional 13 acre-feet that we're not aware of.

THE COURT: Okay

MR. FISHER: But you're not disputing it; correct?

MR. READ: Your honor, it benefits us as well as Ms. Tanner. We don't dispute other than the fact that if it's being taken from someone and placed into our names one half each and there's a later lawsuit, you know, we—Ms. Tanner will be brought into that lawsuit for her one half of the—back in. That's our only problem with quite a few of these, is we're just being told we have more than we believed we had, and that's not just based on what our belief was, but based on prior representations by the Water District themselves.

¶ 25 Despite these statements, the court held that neither Lloyd nor Tanner was entitled to any portion of the water designated by the State Engineer's Office as belonging to the partners of the former Dixie Properties partnership. Tanner faults the district court for failing to honor the "stipulation" made in the above-referenced transcript citations.

¶ 26 On appeal, the Carters argue that their "stipulation" was necessarily contingent upon the court finding that Lloyd was in fact entitled to a quarter of the amount shown by the State Engineer's office. Examination of the relevant transcript references demonstrates that the contingent nature of the Carters' statements should have been readily apparent to all the parties. Clearly, the Carters were not affirming that the State Engineer's figures were correct as to the amount of water owned by Lloyd. Nor could they bind the court or any other parties with a mistaken belief that they owned any of the water shown by the State Engineer to be in the possession of the former Dixie Properties' partners. In fact, the transcript statements cited by Tanner in her brief amount to nothing more than a repetition of the undisputed fact that Tanner was entitled to half of any water Lloyd owned at the time of their divorce. Beyond that, the Carters' statements merely express a hope or belief that Lloyd himself might be entitled to his own half of any water he retained from the former Dixie Properties partnership.

■■ ¶ 27 In any event, the court clearly had the discretion to set aside the stipulation if it was based on erroneous assumptions that could affect the rights of parties who

had not participated in the stipulation. *See First of Denver Mortgage Investors v. C.N. Zundel,* 600 P.2d 521, 527 (Utah 1979) (holding the court "has the power to set aside a stipulation entered into inadvertently or for justifiable cause"). In this case, it is undisputed that the other Dixie Properties partners were not present to defend their interests. The Carters explicitly acknowledged this dilemma by expressing concern that any award infringing the interests of those partners could subject both Lloyd and Tanner to further litigation. This fact alone permitted the court to disregard any statements by the Carters as to a hope or belief that they owned any portion of the Dixie Properties water.

¶ 28 As part of her effort to marshal the evidence, Tanner concedes that Steve testified that he and Lloyd had already received their share of the Dixie Properties water upon the dissolution of the partnership. She then cites to purportedly contradictory exhibits, which she claims render the court's finding clearly erroneous. We are unable to consider these exhibits. Tanner refers to them by number, apparently according to their presentation at trial. However, those exhibits either were not included in the record on appeal, or else Tanner has failed to give sufficient direction as to where they may be found.

¶ 29 Moreover, even if Tanner had properly presented evidence to this court that contradicted other testimony at trial, the court was still entitled to resolve unclear or inconsistent evidence in favor of a finding that the Carters had no interest in the remaining Dixie Properties water—particularly where the rights of third parties were implicated. We therefore affirm the district court's ruling.

### III. THE CLEVER DEED

¶ 30 The third argument that Tanner raises pertains to the "Clever deed." She maintains that the parties stipulated that she was to receive half of the water described in that deed. The court's only apparent reference to this matter is in its supplemental findings and conclusions, where it ruled that "[t]he evidence was insufficient to establish a conveyance from Clever." On appeal, the Carters concede error on this point and state their belief that Tanner is entitled to an additional 3.2 acre-feet from the Clever deed. We therefore remand this issue to the district court to consider the stipulation, clarify its findings, and modify the judgment if appropriate.

### IV. CONSPIRACY

■ ¶ 31 Tanner raised a civil conspiracy claim in the district court. She alleged that the Carters had conspired to deprive her of water rights. The court held that the Carters had indeed "purposefully fail[ed] to disclose all potential water rights interests to Tanner." The court further found that these actions had "increased the complexity and length of this litigation." [9]

¶ 32 However, the court rejected Tanner's substantive claims of conspiracy on the ground that the Carters had not profited from their misconduct and that Tanner consequently could not receive half of what Lloyd did not own. Specifically, the court held as follows:

> Kristy Enterprises [and] the Carter Defendants held the[ ] water rights [of which Tanner alleged she had been deprived by the conspiracy] subject to a constructive trust for the benefit of the [bona-fide third party purchasers], and any excess water after resolving these claims would revert to the Emil J. Graff Revocable Trust. Therefore, this Court concludes that any efforts made by the Carters to deflect Mary Tanner's claims ultimately profited them nothing. [10]

9. In connection with this holding, the court awarded Tanner attorney fees.

10. Apparently, this holding dealt primarily with the master deed to water right 81–1475 that Graff had handed to Steve in response to the query about how to satisfy the rights of bona-fide purchasers, and did not include the three whited-out deeds within its scope. The court elsewhere ruled that "the whited-out deeds were evidence of legitimate transactions with Howard Carter and, at the time of the Tanner/Carter divorce, Lloyd Carter had no interest in the water described in those deeds which has not been accounted for herein."

¶ 33 On appeal, Tanner concedes that she was obligated to prove her claim at trial by clear and convincing evidence-an even higher evidentiary standard of proof than the preponderance standard under which the balance of her claims were treated. *See Crane Co. v. Dahle,* 576 P.2d 870, 872 (Utah 1978). She also acknowledges that the court's "factual determinations are [reviewed] under a marshalling [sic] standard." She then proceeds to list only the facts that she believes contradict or undermine the district court's ruling. In other words, she simply attempts to retry the case. She makes no effort whatsoever to marshal the evidence supporting the district court's findings. We therefore decline to treat this issue.

## V. THE COURT'S RULINGS WITH RESPECT TO WATER RIGHT 81–1475

¶ 34 At trial, Tanner argued that she was entitled to half of the water from the master deed for water right 81–1475. The basis for this claim proceeded from a complicated chain of events. In 1989, at about the same time the Carters returned unsold property and water rights to Graff by deed in lieu of foreclosure, Graff handed Steve the master deed to water right 81–1475 (pertaining to 425.94 acre-feet). Tanner first asserted that this "transfer" validly conveyed title to Kristy Enterprises. She then relies on the 1984 warranty deed granted to Lloyd by Kristy Enterprises, which contained an after-acquired property clause relating to any future water rights. Thus, according to her argument, the 1984 warranty deed transferred all water rights thereafter falling into Kristy Enterprises' possession to Lloyd; [11] and because it was conceded that Lloyd and Steve failed to deliver any water rights from the master deed to the bona-fide purchasers prior to Lloyd and Tanner's divorce, she contends that she is entitled to half of water right 81–1475.

¶ 35 The Carters testified that Graff had given Steve the deed for the sole purpose of satisfying the claims of bona-fide purchasers. Although Steve admitted at one point that he had hoped to retain any remaining water rights after satisfying outstanding claims, he conceded that he had not given any consideration for the water rights and that he had not understood that Graff intended to give him any water other than that necessary for meeting third party obligations. The Carters prepared a "correction deed" in 1992, which purported to clarify the nature of the 1984 warranty deed as a security instrument.

¶ 36 The district court premised its ruling that neither the Carters nor Tanner were entitled to any portion of the deed to water right 81–1475 on two grounds. First, the court held that the Carters never acquired title to the deed, but instead held it in constructive trust for the bona-fide purchasers, with the remainder to revert to Graff. The court also ruled that the 1984 warranty deed had not been intended to actually transfer any present or future interest in water rights, but had been given simply as a security interest to Lloyd.

¶ 37 We affirm on the latter ground. Kristy Enterprises did not possess title to the master deed for water right 81–1475·at the time it executed the 1984·warranty deed in favor of Lloyd because that deed had been placed in escrow. Kristy Enterprises was dissolved in 1987. "[A] corporation administratively dissolved ... continues its corporate existence but may not carry on any business except ... the business necessary to wind up and liquidate its business and affairs...." Utah Code Ann. § 16–10a–1421(3)(a) (Supp.2000). Moreover, a warranty deed may be delivered without the present intent to convey, and may function as a security instrument under certain circumstances. *See Winegar v. Froerer Corp.,* 813 P.2d 104, 110 (Utah 1991). Proof that a deed was intended as a security instrument must be presented by clear and convincing evidence. *See id.*

¶ 38 Both Steve and Lloyd testified that neither of them believed the deed was in-

---

11. For reasons that are not apparent in this appeal, neither the district court nor any of the parties have addressed the implications of Kristy Enterprises' 1987 dissolution. All of them have apparently simply treated Kristy Enterprises' former liabilities and assets as Steve and Lloyd's personal liabilities and assets.

tended to transfer any water rights under application 81–1475. Kristy Enterprises' business in 1984 was primarily focused on dispensing, rather than retaining for itself, various water rights to bona-fide purchasers. The Carters reaffirmed this fact when they testified that the 1984 warranty deed functioned as a security interest and was never intended to grant Lloyd the right to attack or defeat the rights of either Graff or any bona-fide purchasers. Lloyd's testimony in this regard was against his own pecuniary interest.

¶ 39 Moreover, the deed itself specifically disavowed any present ownership of that water right and merely expressed an obligation to transfer future rights. As such, it could not be construed as a present intent to convey any of the water described in application 81–1475. Relying on this evidence, the district court found that the after-acquired property clause of the 1984 warranty deed was not intended to, and could not, presently convey title to a deed that was nominally acquired several years later by a dissolved corporation for the sole purpose of satisfying its liabilities.

¶ 40 Tanner has not marshaled any of this evidence in her brief. Nor does she directly challenge the court's construction of the deed as a security interest. Instead, she simply misconstrues the court's construction of the intent underlying the deed as an invalid "reformation" of the deed. Because the court possessed substantial evidence upon which it could base a ruling that the deed was intended purely as a security interest, and Tanner has not met her burdens of challenging this ruling on appeal, there is no basis for us to reverse the court's holding on this issue.[12]

## VI. THE 1992 CORRECTION DEED AND REFORMATION OF OTHER DEEDS

¶ 41 The district court held that the 1992 correction deed, which purported to reform the 1984 warranty deed to avoid transfers of any water rights from Kristy Enterprises to

Lloyd, was valid. The court also purported to reform both the Master Deed to water right 81–1475 and the 1984 warranty deed as a means of imposing its constructive trust. Tanner contests these rulings. She asserts the evidence shows the correction deed was prepared for the purpose of depriving her of her rights and not as a sincere attempt to clarify the earlier warranty deed. She also maintains that the court exceeded its authority in reforming various deeds to conform to its imposition of a constructive trust. We find it unnecessary to address these arguments. Because we have affirmed the court on a distinct ground with regard to the 1984 warranty deed, we need not consider arguments concerning its imposition of a constructive trust, and, even disregarding the correction deed, there is ample evidence to support the court's finding that the after-acquired property clause in the 1984 warranty deed was originally intended only to create a security interest rather than to convey title to Lloyd.

## VII. VARIOUS QUITCLAIM DEEDS TO VARIOUS BONA–FIDE PURCHASERS

¶ 42 Finally, Tanner argues that the district court had no power to approve as valid a number of quitclaim transfers to bona-fide purchasers, because Kristy Enterprises did not own the water rights at the time they were purportedly transferred. We first note that Tanner has inadequately briefed this issue. She does not list any purchasers by name; nor does she offer even a cursory description of the purportedly invalid transactions or transfers. Tanner also misconstrues the import of the court's holding. The bona-fide purchasers had entered into valid contracts for the water rights. Under the contracts, Kristy Enterprises was obligated to ensure that the bona-fide purchasers received the rights for which they had contracted. The court's ruling merely validated those rights. Accordingly, we reject Tanner's arguments on this issue.

---

12. Because we affirm on this ground, it is unnecessary for us to reach Tanner's argument that she is "a bona fide purchaser for value of water right 81–1475" who "gave value by transferring her

interest in marital property, both real and personal property, to obtain her interest in the water right."

## CONCLUSION

¶ 43 In conclusion, we affirm the bulk of the court's verdict. We remand as noted above issues relating to the Cox deed and the Clever deed.

¶ 44 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice WILKINS concur in Justice DURRANT's opinion.