2001 UT 107

Jo–Ann KILPATRICK, George L. Gonzales, Joseph C. Lee, David B. Lee, Marilyn D. Lee, Sidney W. Foulger, Clayton F. Foulger, Bryant F. Foulger, Brent K. Pratt, Mountain West Television Company, a Utah general partnership, and MWT Corporation, a Utah corporation, Plaintiffs and Appellees,

v.

WILEY, REIN & FIELDING, a professional law partnership, and Richard E. Wiley, Defendants and Appellants.

No. 990784.

Supreme Court of Utah.

Dec. 14, 2001.

Harold G. Christensen, Reed L. Martineau, Rex E. Madsen, Richard A. Van Wagoner, Keith A. Call, Salt Lake City, for plaintiff.

Daniel L. Berman, Peggy A. Tomsic, David P. Williams, Salt Lake City, Mark R. Kravitz, Timothy A. Diemand, New Haven, CT, for defendants.

DURRANT, Justice:

¶ 1 Plaintiffs brought this legal malpractice action against the law firm Wiley, Rein & Fielding ("Wiley Rein") and against Richard Wiley, senior partner at Wiley Rein. Plaintiffs alleged that defendants represented them from 1981 until 1991 in connection with their efforts to purchase and operate the Channel 13 television station in Salt Lake City and that, during the latter portion of this representation, defendants repeatedly breached fiduciary duties they owed to plaintiffs. Following a lengthy trial, the jury reached a verdict for plaintiffs. Defendants appeal, contending the trial court committed numerous errors requiring reversal. They argue that the trial court incorrectly ruled that, as a matter of law, Wiley Rein had an attorney-client relationship with plaintiffs; that the trial court erred in instructing the jury not only as to their own affirmative defenses, but also as to plaintiffs' theory of the case; that the trial court committed multiple errors in connection with both the apportionment and amount of damages; and that Richard Wiley had no attorney-client relationship with any plaintiff. Plaintiffs bring a conditional cross-appeal alleging that the trial court erred in not ruling that Richard Wiley had an attorney-client relationship with each plaintiff who was also a Wiley Rein client; that the trial court erred in limiting the purposes for which an indemnification agreement was admitted; and that the trial court erroneously excluded the report and testimony of an expert witness as irrelevant. We reverse the jury's verdict and remand for further proceedings.

## BACKGROUND

■ ¶ 2 "On appeal from a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to that verdict." *Pratt v. Prodata, Inc.*, 885 P.2d 786, 787 (Utah 1994). "We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116.

¶ 3 In 1980, the Federal Communications Commission ("FCC") announced it would issue a license for a new VHF television channel in the Salt Lake City area, Channel 13. Barry Wood, a communications attorney with the law firm Kirkland & Ellis, approached David Lee and encouraged him to apply for the license. David Lee approved of the proposed venture, and, in furtherance of that venture, Wood formed Mountain West Television Company (MWT Company), a general partnership consisting of partners David Lee, Joseph Lee (David Lee's father), Jo-Ann Kilpatrick, Sidney Foulger, George Gonzales, Brent Pratt (Sidney Foulger's son-in-law), and Doug Cardon, to apply for the Channel 13 license. Acting on Wood's advice, David Lee, Pratt, and Cardon subsequently withdrew from the partnership.

¶ 4 Wood was retained to assist in the complex process of applying for the license. As part of his representation during the application process, Wood required detailed, confidential information from the remaining MWT Company partners—Joseph Lee, Sidney Foulger, Kilpatrick, and Gonzales (collectively, the "MWT Company partners")—concerning their personal backgrounds, experience, financial limitations, business activities and strategies, strengths and weaknesses, and other matters.

¶ 5 In 1983, several attorneys, including Wood, left Kirkland & Ellis and formed what is now the law firm Wiley, Rein & Fielding.[1] At this time, the application process was ongoing. After joining Wiley Rein, Wood continued to represent MWT Company and the MWT Company partners in their efforts to obtain the Channel 13 license. Wood also routed copies of his correspondence with MWT Company and the MWT Company partners, as well as other related documents, to Richard Wiley and John Quale, Wood's supervising partner. By virtue of this representation, MWT Company and the MWT Company partners became Wiley Rein's clients.[2]

¶ 6 Wood presented the MWT Company partners and other potential investors with several detailed projections to demonstrate

---

1. The law firm was originally called Wiley, Johnson & Rein. Its name was later to changed to Wiley, Rein & Fielding. Throughout this opinion, we refer to the firm as "Wiley Rein."

2. Defendants dispute this, arguing that only MWT Company was a client.

the immense value of the Channel 13 license and the future income and distributions stemming from the license. Wood estimated that, when Channel 13 initially went on the air, it would be worth between $30 and $40 million.

¶ 7 Five applicants, including MWT Company, were vying for the Channel 13 license before the FCC. In 1984, Wood represented MWT Company and the MWT Company partners at an FCC evidentiary hearing. Despite the efforts of MWT Company and the MWT Company partners, the FCC awarded the Channel 13 license to another applicant in 1985. MWT Company was ranked second of the five applicants, and Wood advised the MWT Company partners to appeal the FCC decision. The FCC appeal ended in the same result.

¶ 8 After the appeal, Wood was convinced the winning applicant would be willing to sell its position. Under FCC regulations, MWT Company could still obtain the license at this point by buying out each of the other applicants. Accordingly, Wiley Rein encouraged MWT Company and the MWT Company partners to pursue a buyout of each of the other applicants to secure the Channel 13 license. MWT Company and the MWT Company partners elected to pursue this course, and they began to seek a financing partner to aid in buying out the other applicants and constructing and starting the new station to operate as Channel 13.

¶ 9 At this same time, Wiley Rein began representing Adams Communications, which owned several broadcast properties, most notably, KSTU Channel 20, a Salt Lake UHF television station. Because MWT Company planned to compete directly against Channel 20, MWT Company and the MWT Company partners objected to Wiley Rein's representation of Adams. Wiley Rein assured them there was no immediate conflict of interest, and if there ever were, Wiley Rein would not represent either party. Nevertheless, in January of 1986, without plaintiffs' knowledge, Wiley Rein represented Adams in exploring the possible purchase of Channel 13 and sale of Channel 20; however, such a transaction was never completed.

¶ 10 Northstar Communications, Inc., a Delaware corporation primarily owned by Allstate Insurance Company, was created in early 1986 to invest in communications properties. Unbeknownst to MWT Company and the MWT Company partners, Wiley Rein represented Northstar, and Richard Wiley was one of Northstar's two directors. In the spring of 1986, two Northstar officers approached Wood regarding the possibility of acquiring an interest in Channel 13. Wood responded that Wiley Rein was then representing MWT Company in its attempt to secure the Channel 13 license, and if Wiley Rein were to represent Northstar in acquiring an interest in Channel 13, it would have conflicting interests. Accordingly, Wood advised the two Northstar officers to seek other legal counsel in the matter.

¶ 11 In June 1986, Richard Wiley and Quale went to Wood's office to discuss with him the Channel 13 license. They informed Wood that Wiley Rein would represent Northstar in its efforts to acquire an interest in the Channel 13 license. Wood objected, reiterating that such representation would create impermissible conflicts of interest and that Northstar should secure separate counsel. Richard Wiley told Wood, however, that "this is just the start of something that's going to be very big. They [Northstar] have all this money behind them from Allstate," another Wiley Rein client. When Wood continued to object, Richard Wiley stated, "This is Allstate," and urged him to "think of the fees." Wiley Rein ultimately elected to represent Northstar in the Channel 13 matter.

¶ 12 Richard Wiley then instructed Wood to obtain consent from MWT Company and the MWT Company partners. Wood called Joseph Lee and asked him if the MWT Company partners would object to Wiley Rein's representation of Northstar. After discussing the matter with David Lee, Joseph Lee responded that the MWT Company partners objected to the representation. Wood also spoke with Pratt, a former MWT Company partner, asking him if he "had any problem with [Wiley Rein] bringing Northstar into this deal." Pratt voiced no objection, later stating that he understood Northstar would be brought "into this deal" as a financial advisor, not as a Wiley Rein client with interests adverse to MWT Company's. In short,

although Wood later testified that he obtained consent from some, but not all, of the MWT Company partners, the MWT Company partners contradicted his testimony, stating that if Wood had disclosed to them the full nature of the conflict, they would have had no further dealings with Wiley Rein.

¶ 13 By late summer of 1986, MWT Company and the MWT Company partners received two commitments for financial aid, which they reviewed with Wood. The first came from Communications Partners, Ltd., and the second was from Northstar. Both Communications Partners and Northstar sent projections and financing offers to Wood, and Wood passed them on to the MWT Company partners. The commitments offered by Northstar and Communications Partners each provided for MWT Company to receive approximately $10 million in funding. In return, MWT Company would give up a sixty percent interest in the Channel 13 venture to the party, either Northstar or Communications Partner, from which it accepted this funding. Wood advised the MWT Company partners to accept the Northstar commitment and negotiated on their behalf with representatives from Northstar and its primary owner, Allstate.

¶ 14 At about this time, Pratt contacted Ralph Hardy, a communications attorney at the law firm Dow, Lohnes & Albertson, on behalf of Sidney Foulger. Sidney Foulger sought an independent assessment of the value of the Channel 13 license, and Hardy began serving as Sidney Foulger's financial advisor. Wood, however, continued in his role as negotiator for MWT Company and the MWT Company partners.

¶ 15 Relying on Wood's advice and still unaware of the nature and extent of Wiley Rein's representation of Northstar or Richard Wiley's position as a director of Northstar, the MWT Company partners verbally accepted Northstar's commitment. Wood then personally contacted Communication Partners and informed it that MWT Company and the MWT Company partners had rejected its proposed commitment.

¶ 16 During the fall of 1986, Wood continued to negotiate on behalf of MWT Company to buy out the interests of the other four applicants for the Channel 13 license. Ultimately, he was successful in these negotiations. The agreements obligated MWT Company to pay approximately $5 million to buy out the other applicants, $2 million of which was due in November 1986. In return, MWT Company became the sole surviving applicant, and it was thus positioned to receive the Channel 13 license. The MWT Company partners were allegedly unaware, however, that two of the complex buyout agreements drafted by Wiley Rein unconditionally obligated the MWT Company partners personally to pay $3 million of the $5 million buyout of the other applicants by mid-November 1986, regardless of whether any outside funding was ever realized.

¶ 17 In November 1986, just days before MWT Company and the MWT Company partners were obligated to begin payment on the agreements they entered to buy out the other four applicants for the Channel 13 license, the MWT Company partners met with representatives from Northstar to finalize their acceptance of Northstar's financial commitment in the Channel 13 venture. Under the terms of the commitment, Northstar had agreed to provide approximately $10 million in return for a sixty percent interest in the Channel 13 venture. Further, Northstar was to assume all financial risk in the venture.

¶ 18 The agreements presented at the November meeting, however, differed significantly from Northstar's prior commitment. Under the terms of the November agreements, a limited partnership, MWT, Ltd., was formed. MWT, Ltd., consisted of Northstar, the MWT Company partners, and MWT Corporation, a Utah corporation whose shares were held by Joseph Lee, Sidney Foulger, Kilpatrick, and Gonzales.[3] MWT Corporation was the sole general partner, and Northstar and the MWT Company partners were limited partners.[4] However, Northstar was given the option, which ex-

---

**3.** As part of the agreement, defendants contend, the original MWT Company general partnership was dissolved.

**4.** Joseph Lee gave portions of his interest in MWT, Ltd., to plaintiffs David and Marilyn Lee. Similarly, Sidney Foulger gave portions of his interest in MWT, Ltd., to plaintiffs Clayton Foulger, Bryant Foulger, and Pratt.

pired 180 days from the time Channel 13 went on the air, to convert its position to that of sole general partner of MWT, Ltd., by making an additional $500,000 capital contribution. This option would serve to remove the MWT Company partners from controlling the management of Channel 13 [5] and had not been a part of the initial commitment from Northstar presented to the MWT Company partners in the late summer. Allstate, Northstar's primary owner and a Wiley Rein client itself, contemplated the MWT Company partner's role in Channel 13's operations as, primarily, "a public relations bridge into the Salt Lake City Mormon community."

¶ 19 Additionally, the November agreements reduced Northstar's financing burden from the previously committed $10 million to just under $7 million. While reducing its own contemplated funding, Northstar then insisted that Sidney Foulger assume an obligation to loan $2.6 million of the nearly $7 million in funding. Northstar threatened to refuse to enter any agreement with the MWT Company partners without this loan. After some negotiation, it was agreed that Sidney Foulger would be given the option to make the loan, but, if he declined to exercise the option, he would forfeit $150,000 and a portion of his partnership interest. Further, Northstar refused to provide the $2.6 million if Sidney Foulger did not make the loan, stating that it would only agree to make its "best efforts" to obtain additional financing.

¶ 20 While Northstar's commitment had contemplated that it would bear all risks of financial loss, the November agreement included a "cash call" provision, whereby the MWT Company partners could be held personally liable for negative balances in their partnership accounts. Further, Wood informed the MWT Company partners that,

under the terms of one of the buyout agreements with another applicant for the Channel 13 license, an agreement prepared by Wood, they were personally liable for approximately $1 million. Deeply concerned about this possibility, Sidney Foulger asked Hardy to protect his interests as best he could.[6]

¶ 21 When David Lee objected to the reduced funding and other terms and then reminded the present Wiley Rein attorneys that Wiley Rein was representing the MWT Company partners, Merilyn Strailman, a Wiley Rein attorney, responded that Wiley Rein represented only Northstar.[7] Wood objected, stating that Wiley Rein "can't do this to these people. They're our clients." Nevertheless, the negotiations continued without a change in Wiley Rein's representation of any of the parties involved.

¶ 22 Even though the MWT Company partners then learned, in November 1986, that Wiley Rein represented Northstar against them, it was too late to seek other financing or counsel. The first payment under the buyout agreements, approximately $2 million, was due in a matter of days, and Wood had already informed Communications Partners that MWT Company and the MWT Company partners had rejected its proposed financing commitment. In light of this, the MWT Company partners entered into the agreements.

¶ 23 Following execution of the agreements with Northstar, Wood petitioned the FCC to substitute MWT, Ltd., for MWT Company as the applicant for the Channel 13 license. The FCC granted this petition and, in December 1986, awarded the license for Channel 13 to MWT, Ltd. Wood and Wiley Rein continued to represent MWT Corporation,

---

5. The MWT Company partners would have retained control of the management of Channel 13 under the terms of Communications Partners' commitment.

6. Plaintiffs contend that, prior to this point, Hardy had acted only as a financial consultant and that this was his "first legal representation." Further, plaintiffs point out that this representation was limited to Sidney Foulger and did not include MWT Corporation, MWT Company, or any of the other MWT Company partners.

Defendants claim that throughout the November 1986 negotiations, MWT Company and the

MWT Company partners were represented by Hardy. They disagree with plaintiffs' contention that Hardy served only as a financial consultant for the Foulger family, stating that Hardy was MWT Company's counsel in negotiating both the financing agreement with Northstar and the buyout agreements with the other applicants for the Channel 13 license.

7. Plaintiffs point out that, despite this statement, Wood recorded over 40 hours during the November meetings for his work as MWT Company's counsel.

MWT Ltd., and the MWT Company partners.[8]

¶ 24 While the MWT Company partners had planned on competing with Channel 20, a Salt Lake UHF television station, they learned in late February 1987 that Northstar had decided that MWT, Ltd., should purchase Channel 20 from Adams for approximately $30 million to acquire equipment and programming for Channel 13. Northstar proposed to (1) borrow $10 million of the purchase price from Adams and (2) borrow $22.5 million from Aetna Insurance Company to fund the remainder of the purchase price. When the MWT Company partners objected to the purchase, Northstar's representatives stated that if they refused to allow MWT, Ltd., to purchase Channel 20, Northstar would not provide the funding it had agreed to at the November 1986 meetings, thereby forcing a sale of Channel 13. Because this would leave the MWT Company partners with a total loss of any interest in Channel 13, the MWT Company partners acceded to Northstar's demands. Because of the Channel 20 purchase, MWT, Ltd., acquired a purchase debt load of $30 million.

¶ 25 Defendants advised and assisted Northstar concerning the Channel 20 transaction while simultaneously representing Adams in FCC matters. Both Wiley Rein and Hardy represented MWT, Ltd., in the negotiations; however, Hardy's role was merely that of documenting the agreement Northstar had already prepared.

¶ 26 During late 1986 and early 1987, Wood continued to represent the MWT Company partners in obtaining employment agreements with MWT, Ltd., and in seeking agreements from the other applicants and Allstate to release the MWT Company partners from the payment terms of the buyout agreements. He also met with the MWT Company partners and provided advice concerning the anticipated startup of the station, programming, and other matters. At the same time, without the MWT Company partners' knowledge, Wiley Rein attorneys represented Northstar against the MWT Company partners in connection with the MWT Company partners' employment contracts. These employment contracts were ultimately canceled, due to MWT, Ltd.'s large debt load.

¶ 27 In September 1987, Wood left Wiley Rein. At about this time, Farragut Communications, Inc., an Allstate subsidiary, was created to own Northstar's stock. Allstate was Farragut's principal shareholder, and Richard Wiley was a director and ten percent owner of Farragut's common stock. In May 1988, Northstar exercised its right to convert to the sole general partner of MWT, Ltd., replacing MWT Corporation as the general partner in exchange for an additional capital contribution of $500,000. MWT Corporation became a limited partner in MWT, Ltd., joining David and Marilyn Lee, Clayton and Bryant Foulger, Pratt, and the MWT Company partners (this group—MWT Corporation, David and Marilyn Lee, Clayton and Bryant Foulger, Pratt, and the MWT Company partners—is hereafter referred to as the "MWT, Ltd., limited partners").

¶ 28 In 1988, MWT, Ltd., became unable to meet its short-term debt obligations stemming from the purchase of Channel 20. Therefore, MWT, Ltd., secured a loan from Allstate with a twenty-five percent per annum interest rate. Wiley Rein represented both MWT, Ltd., and Allstate at this time. After being given a "going concern qualification" by accountants,[9] MWT, Ltd., suspended payments on Sidney Foulger's, Kilpatrick's, and Joseph Lee's employment contracts. Despite the Allstate loan, MWT, Ltd., was unable to meet the debt obligations it had incurred to fund the Channel 20 purchase, and it elected to put Channel 13 up for sale using Veronis Suhler & Associates, another Wiley Rein client, as its broker.

¶ 29 Richard Wiley, as a director of Northstar, initially objected to the sale of Channel 13. However, ultimately, on October 13, 1989, he voted to make the sale. His decision followed his entering into an agreement with Allstate, Northstar's primary owner, to indemnify him against any claims asserted

---

8. Again, Wiley Rein insists it did not represent any plaintiffs at this time.

9. A "going concern qualification" reflects auditors' substantial doubts as to a company's ability to generate sufficient funds to meet its financial obligations.

against him as a result of, among other things, his actions as a director of Northstar. In April 1990, MWT, Ltd., sold Channel 13 to Fox, another of Wiley Rein's clients, for approximately $41 million.

¶ 30 Plaintiffs filed this lawsuit against defendants in February 1990. Several months later, Allstate's indemnity agreement with Richard Wiley was amended to also indemnify Wiley Rein for any liability stemming from this lawsuit.

¶ 31 None of the plaintiffs received any proceeds from the sale of Channel 13 to Fox, due to the large debt load MWT, Ltd., was under when it sold the station. Moreover, in December 1991, Northstar sent a memorandum to several of the plaintiffs informing them they were obligated to make up deficiencies in their limited partner capital accounts. This "cash call" totaled over $2 million for the unpaid debts of MWT, Ltd. The affected plaintiffs refused to pay on the cash call, and no further action was taken by either Northstar or these plaintiffs in this regard.

¶ 32 In December 1997, after a three-month trial, the jury concluded defendants did, in fact, breach fiduciary duties to plaintiffs. The jury determined the total damages were over $23 million, including damages for plaintiffs' lost ownership interest, lost cash distributions, the cash call, and punitive damages based on the cash call. When reduced for plaintiffs' comparative fault, the damages totaled over $18 million.

### DISCUSSION

¶ 33 Defendants raise numerous issues on appeal. They contend the trial court erred in (1) instructing the jury that, as a matter of law, Wiley Rein had an implied attorney-client relationship with the MWT, Ltd., limited partners, (2) instructing the jury on how to apportion and allocate fault, (3) not instructing the jury regarding the defenses of waiver and estoppel, (4) allowing the jury to base its verdict on the theory of breach of duty of confidentiality without evidence to support such a theory, (5) instructing the jury as to the date by which it should measure damages, (6) allowing the jury to award ownership and cash distribution damages because there was insufficient evidence to sup-

port such awards, and (7) allowing the jury to award damages based on the cash call.

¶ 34 In addition to these claims, Richard Wiley also contends the trial court erred in (1) allowing the jury to find he had an attorney-client relationship with MWT Corporation, (2) allowing the jury to award actual damages based on the cash call, and (3) allowing the jury to award punitive damages based on the cash call.

¶ 35 On conditional cross-appeal, plaintiffs contend the trial court erred in (1) refusing to rule as a matter of law that Richard Wiley had an attorney-client relationship with those plaintiffs who were found to be Wiley Rein clients, (2) ruling defendants' indemnity agreements with Allstate were only admissible for certain purposes consistent with rule 411 of the Utah Rules of Evidence, and (3) excluding the expert report and testimony of Albin Seethaler.

¶ 36 We conclude the trial court committed reversible error in ruling that, as a matter of law, Wiley Rein had an implied attorney-client relationship with the MWT, Ltd., limited partners. In light of this conclusion, we only briefly address the other issues raised in defendants' appeal to provide guidance for the trial court on remand. *See Buzas Baseball v. Salt Lake Trappers*, 925 P.2d 941, 949 (Utah 1996). Our decision also requires us to address the issues plaintiffs raise in their conditional cross-appeal. As to those issues, we conclude that the trial court erred in refusing to rule as a matter of law that Richard Wiley had an attorney-client relationship with those plaintiffs who were found to be Wiley Rein clients, but that the rulings on the admissibility of both the indemnity agreements and the expert report and testimony of Albin Seethaler did not exceed the trial court's permitted discretion.

### I. IMPLIED ATTORNEY-CLIENT RELATIONSHIP

¶ 37 MWT, Ltd., the limited partnership formed in 1986 during the effort to buy out the other applicants for the Channel 13 license, consisted of MWT Corporation, the MWT Company partners, and Northstar. It is undisputed that Wiley Rein represented MWT, Ltd., and Northstar from May 1988, following Northstar's conversion to general

partner of MWT, Ltd., until December 1991, the date of Northstar's cash call; however, Wiley Rein denied representing any of the plaintiffs during this time period.

¶ 38 At trial below, plaintiffs asserted that Wiley Rein's work in representing MWT, Ltd., and Northstar directly involved the interests of the MWT, Ltd., limited partners. Because of this direct involvement, plaintiffs argued, Wiley Rein had implied attorney-client relationships with the MWT, Ltd., limited partners from May 1988 through December 1991. The trial court agreed and granted plaintiffs' motion for a partial directed verdict on the issue. Accordingly, the jury was instructed that, as a matter of law, Wiley Rein had an attorney-client relationship with the MWT, Ltd., limited partners from May 1988 to December 1991. On appeal, Wiley Rein contends the trial court's partial directed verdict ruling constituted reversible error.

### A. The Test for an Implied Attorney–Client Relationship

¶ 39 A trial court is "justified in granting a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467. In reviewing a trial court's decision to grant a motion for a partial directed verdict, we apply the same standard " 'as that imposed upon a trial court.'" *Id.* (quoting *Mgmt. Comm. of Graystone Pines Homeowners Ass'n v. Graystone Pines, Inc.*, 652 P.2d 896, 898 (Utah 1982)). Accordingly, we can only affirm a trial court's grant of a motion for a partial directed verdict if " 'the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting *Cornia v. Wilcox*, 898 P.2d 1379, 1383 (Utah 1995)).

¶ 40 After reviewing the trial court's ruling under this standard, we conclude the trial court misinterpreted our case law and, thus, erroneously granted plaintiffs' motion for a partial directed verdict on this issue. The trial court concluded that defendants had an implied attorney-client relationship with the MWT, Ltd., limited partners, who are all plaintiffs in this action, based on defendants' direct involvement with those plaintiffs' legal interests. However, the

proper determination of whether an implied attorney-client relationship exists hinges on whether the party had a *reasonable belief* that it was represented. That an attorney is directly involved in that party's legal interests is but one factor to consider in making this determination.

¶ 41 This issue is governed by our earlier opinion in *Margulies v. Upchurch*, 696 P.2d 1195 (Utah 1985). In that case we found improper a law firm's representation of several plaintiffs in a lawsuit against three doctors, where the law firm had an implied attorney-client relationship with those doctors stemming from a separate pending lawsuit.

¶ 42 In *Margulies*, the law firm Jones, Waldo, Holbrook & McDonough represented the Margulies family as plaintiffs in a medical malpractice action filed in the Third District Court. *Id.* at 1198. The defendants in that action included three doctors. These doctors were also limited partners in Diversified Energies/Intermountain Capital Private Drilling Fund 1981–A, a Utah limited partnership. *Id.*

¶ 43 At the same time the Margulies' medical malpractice action was pending, the Diversified Energies limited partnership was involved in unrelated litigation in federal court with Jones, Waldo serving as its counsel. *Id.* In order to become limited partners in Diversified Energy, the three doctors had been required, among other things, "to purchase units in Diversified Energy by paying twenty percent of the value of the units in cash and financing the remaining eighty percent by obtaining individual, personal letters of credit." *Id.* Jones, Waldo's representation of Diversified Energies in the federal case "was aimed at preventing foreclosure on the individual letters of credit." *Id.*

¶ 44 In light of these facts, the defendant doctors in the Margulies' medical malpractice case "attested that . . . their impression and belief" was that Jones, Waldo represented them individually in the Diversified Energies federal case. *Id.* at 1200. Accordingly, the three doctors moved to have Jones, Waldo disqualified as plaintiffs' counsel. *Id.* at 1199. The trial court concluded that Jones, Waldo must either withdraw from the Margulies' action or withdraw from the Diversi-

fied Energies' action and not use any information "gained or available in connection with the federal court action." *Id.* (internal quotations omitted). Jones, Waldo elected to withdraw from its representation of Diversified Energies in the federal action. *Id.*

¶ 45 The defendants in the Margulies' medical malpractice case appealed the trial court's order allowing Jones, Waldo to continue as the plaintiffs' counsel in that action. *Id.* at 1198. We agreed and reversed the trial court and ordered that Jones, Waldo be disqualified from serving as the Margulies' counsel in their medical malpractice action. *Id.* at 1205.

¶ 46 Our conclusion was based, in large part, on our determination that Jones, Waldo not only represented Diversified Energies in the federal case, but, under the circumstances of that case, also had an implied attorney-client relationship with the three doctor defendants in the Margulies' action who were also limited partners in Diversified Energies. *See id.* at 1200–02. In reaching this conclusion, we reiterated the general rule that an attorney who represents a limited partnership represents only the entity itself, not the individual limited partners. *See id.* at 1200 (stating that "representation of a limited partnership does not of itself require allegiance to the interests of the limited partners").

¶ 47 We also recognized in *Margulies* that there could be exceptions to this general rule, however, holding that an implied attorney-client relationship with the individual limited partners may arise under certain circumstances. *Id.* at 1200–01. Specifically, we concluded that such a situation may arise when the individual limited partners *reasonably believe* they are individually represented by the limited partnership's legal counsel. *See id.* at 1200. We went on to state that "[w]hen ... the individual interests of the limited partners are *directly involved*, ... there may be sufficient grounds for implying the existence of an attorney-client relationship." *Id.* at 1201 (emphasis added). Under the circumstances of *Margulies*, we concluded that the three doctors' "impression and belief," *id.* at 1200, that they were individually represented by Jones, Waldo was reason-

able in light of the fact that Jones, Waldo's representation of Diversified Energies directly benefitted the three doctors. *See id.* at 1200–01.

¶ 48 The trial court here found an implied attorney-client relationship based solely on its conclusion that Wiley Rein was "directly involved" with the interests of the individual limited partners of MWT, Ltd. However, the court did not then go on to conclude that the individual limited partners reasonably believed Wiley Rein represented their individual interests from May 1988 through December 1991. Indeed, in evaluating the existence of an express attorney-client relationship, the court indicated that it had reached the opposite conclusion. Specifically, the court rejected as "[un]warranted" the plaintiffs' asserted belief that Wiley Rein continued to represent them after the departure of Barry Wood. In support of this conclusion, the court noted that Wood sent Joseph Lee several letters "indicating he had left Wiley Rein to join plaintiff David Lee at Jones, Waldo's Washington, D.C. law office, and taken plaintiff's files with him." We conclude the trial court's ruling misinterpreted *Margulies*.

■ ¶ 49 *Margulies* did not, as the trial court interpreted it, create two separate tests to determine whether an implied attorney-client relationship exists. Under the trial court's reading of *Margulies*, an attorney-client relationship may exist where *either* the limited partners reasonably believe the limited partnership's counsel represents them individually, *or* where the limited partnership's legal counsel does work that directly involves the limited partners' interests. However, *Margulies* adopted only one test to determine whether an implied attorney-client relationship exists, i.e., whether the individual limited partners reasonably believed that the limited partnership's legal counsel represented their interests. In resolving this question, a court looks at the totality of the circumstances, *see, e.g., Rhode Island Depositors Economic Protection Corp. v. Hayes*, 64 F.3d 22, 24–26 (1st Cir.1995), including whether the limited partnership's legal counsel was "directly involved" with the individual interests of the limited partners.[10] Thus, direct

10. It is true that in *Margulies* the only factor we discussed was direct involvement; however, in the particular circumstances of that case, that

factor alone was sufficient to support the three doctors' reasonable belief that Jones, Waldo represented them. Yet, in this case, as noted above,

involvement is not a separate test, but only one factor to consider in determining whether the specific circumstances of the case demonstrate the individual limited partners' belief concerning representation is reasonable.

### B. Whether the Error was Harmful

¶ 50 Having concluded the trial court erred in its interpretation of *Margulies,* we now address whether that error requires reversal. Even if a trial court erroneously grants a motion for partial directed verdict, "we will not reverse a judgment merely because there may have been error; reversal occurs only if the error is such that there is a reasonable likelihood that, in its absence, there would have been a result more favorable to the complaining party." *Child v. Gonda,* 972 P.2d 425, 431 (Utah 1998). "'A reasonable likelihood of a more favorable outcome exists when the appellate court's confidence in the verdict actually reached is undermined.'" *State v. Kohl,* 2000 UT 35, ¶ 17, 999 P.2d 7 (quoting *State v. Harrison,* 805 P.2d 769, 781 (Utah Ct.App. 1991)). We conclude the trial court's ruling constituted reversible error.

¶ 51 Plaintiffs argue that any error on this issue is harmless because, even if Wiley Rein did not have an implied attorney-client relationship with the MWT, limited partners from 1988 to 1991, it still had continuing duties of loyalty and confidentiality to those plaintiffs as former clients, and the jury's conclusion that one or both of these duties were breached remains unaffected. However, as further explained below, this argument presupposes that Wiley Rein did, in fact, have an attorney-client relationship with each plaintiff at some time, an issue the jury was never able to decide because of the trial court's partial directed verdict ruling.

¶ 52 Plaintiffs assert that the jury's verdict was based on defendants' breaches of the fiduciary duties of loyalty and/or confi-

dentiality. They correctly contend that the duty of confidentiality is a continuing one owed to former clients. Further, relying on the federal case of *Damron v. Herzog,* they contend that the duty of loyalty also continues after the termination of representation. *See* 67 F.3d 211, 213 (9th Cir.1995) ("[W]e find in the common law a continuing duty owed by attorneys to former clients not to represent an interest adverse to a former client on a matter substantially related to the matter of engagement. When such a duty is breached, the former client may bring a cause of action at law."). Therefore, plaintiffs contend, the trial court's ruling was harmless because even if there was no attorney-client relationship during the time period in question, defendants still had duties of loyalty and confidentiality to plaintiffs as former clients.

¶ 53 We agree with plaintiffs that the duty of confidentiality continues after the termination of representation and that the duty of loyalty also prohibits an attorney from "represent[ing] an interest adverse to a former client on a matter substantially related to the matter of engagement." *Id.* However, we disagree with the plaintiffs conclusion that, in light of this, the trial court's error was harmless.

¶ 54 We disagree because such a conclusion presupposes that, at some time, defendants did have an attorney-client relationship with those plaintiffs. While defendants admit that until 1986, Wiley Rein had an attorney-client relationship with MWT Company, they deny they ever had an attorney-client relationship with plaintiffs, and the testimony of David Wood supported this claim. Certainly, there was evidence presented below that would allow the jury to reject defendants' claims on this point. Plaintiffs presented evidence that Wood was retained by plaintiffs Kilpatrick, Gonzales, Joseph Lee, David Lee, Sidney Foulger, and Pratt to create MWT Company and that Wood continued to represent their interests after creating MWT Company and joining Wiley Rein.[11] Nevertheless, the key point is

---

the trial court concluded there was no reasonable belief of representation despite defendants' direct involvement in the MWT, Ltd., limited partners' interests.

11. While defendants admit that the MWT Company partners initially retained Wood, they argue that when Wood joined Wiley Rein, he brought MWT Company, not the MWT Company partners, as a client.

that the jury was never able to determine whether this was the case in light of the trial court's decision to grant plaintiff's motion for a partial directed verdict on this issue. This being so, our " 'confidence in the verdict actually reached is undermined,' " *Kohl,* 2000 UT 35 at ¶ 17, 999 P.2d 7 (quoting *Harrison,* 805 P.2d at 781), and we conclude that "there is a reasonable likelihood that, in [the] absence [of the trial court's error], there would have been a result more favorable to the complaining party." *Child,* 972 P.2d at 431. Accordingly, we reverse the jury's verdict and remand for a new trial.

## II. OTHER ISSUES COMMON TO DEFENDANTS

¶ 55 Having decided that the trial court committed reversible error by misinterpreting *Margulies,* we need not reach the other issues defendants raise on appeal. Nevertheless, due to the complexities of this case, a brief discussion of these issues is appropriate as guidance for the trial court on remand. *See Buzas Baseball v. Salt Lake Trappers,* 925 P.2d 941, 949 (Utah 1996).

### A. Comparative Fault

¶ 56 To aid the jury in addressing comparative fault, the trial court provided the jury with special verdict forms on which it was allowed to apportion any fault it found. A separate form was provided for each plaintiff seeking recovery. Each form allowed the jury to apportion fault, if any, between the individual plaintiff seeking recovery and defendants. For instance, the special verdict form for plaintiff Joseph Lee only permitted the jury to apportion fault among Wiley Rein, Richard Wiley, and Joseph Lee. Further, the form stated that one-hundred percent of Joseph Lee's damages, if any, had to be apportioned among these three. Defendants contended that plaintiff David Lee was also partly at fault for Joseph Lee's losses, and, accordingly, David Lee should have been included on the special verdict form. The trial court rejected this contention, finding this was not required by section 78–27–39(1) of the Utah Code, which governed the apportionment of comparative fault.

¶ 57 On appeal, defendants contend the trial court erred in limiting the jury's comparative fault determination to apportioning fault only between an individual recovering plaintiff and defendants. In particular, defendants argue that the court's instructions to the jury regarding comparative fault improperly excluded parties who shared in fault.

¶ 58 At the time of trial, Utah's comparative fault statute read as follows:

> The trial court may, and when requested by any party shall, direct the jury, if any, to find separate special verdicts determining the total amount of damages sustained and the percentage or proportion of fault attributable to each person seeking recovery, to each defendant, and to any person who contributed to the alleged injury.

Utah Code Ann. § 78–27–39(1) (1996). In *Field v. Boyer Co.,* we concluded that the comparative fault "statutory scheme, [of which section 78–27–39(1) is a part,] taken as a whole, allows the court to consider the fault of any person but to allocate fault only to plaintiffs, defendants and persons immune from suit." 952 P.2d 1078, 1081 (Utah 1998). As this section was applied by the trial court, the jury was allowed to allocate fault only to the individual recovering plaintiff and defendants on the separate special verdict form, without consideration of other non-recovering plaintiffs.

¶ 59 We do not reach the issue of whether the trial court erred in interpreting the comparative fault statute. Section 78–27–39(1) was amended after trial below, and we conclude the current version will be applicable on remand. In addressing the application of such amendments, we have previously stated as follows:

> [P]rocedural statutes enacted subsequent to the initiation of a suit which do not enlarge, eliminate, or destroy vested or contractual rights apply not only to future actions, but also to accrued and pending actions as well.... Generally, new procedural rules do not affect proceedings completed prior to enactment.... Further proceedings in a pending case are governed by the new law.... However, *when the purpose of an amendment is to clarify the meaning of an earlier enactment, the amendment may be applied retroactively in pending actions.*

*Dep't of Social Servs. v. Higgs,* 656 P.2d 998, 1000–01 (Utah 1982) (emphasis added). In this case, the legislature's intent was to clarify the original meaning of the comparative fault statute. *See* Floor Debate, Utah Judiciary Comm., 1999 Gen. Sess., Jan. 29, 1999 (the amendment's sponsor, Representative John Swallow, stated, "[T]he changes that we are recommending will place us back in pretty much the position we thought we were [in] before this recent Supreme Court case [interpreting the comparative fault statute]."); *see generally Field,* 952 P.2d at 1078–82 (the case referred to by Representative Swallow). Further, in light of the fact that we have now reversed the jury's verdict, the plaintiffs have no vested or contractual right that would prohibit application of the amended statute. Thus, the amended statute will be applicable on remand.

¶ 60 We now address the proper course for the court to take on remand as it relates to the issue of comparative fault. The current version of the comparative fault statute reads as follows:

> The trial court may, and when requested by any party shall, direct the jury, if any, to find separate special verdicts determining the total amount of damages sustained and the percentage or proportion of fault attributable to each person seeking recovery, to each defendant, and *to any other person whether joined as a party to the action or not and whose identity is known or unknown to the parties to the action,* including a person immune from suit who contributed to the alleged injury.

Utah Code Ann. § 78–27–39(1) (Supp.2000) (emphasis added).

¶ 61 The correct application of this statute is best illustrated by example. As noted earlier, the special verdict form for plaintiff Joseph Lee only permitted the jury to apportion fault among Wiley Rein, Richard Wiley, and Joseph Lee. Defendants contended that plaintiff David Lee was also partly at fault for Joseph Lee's losses and that, accordingly, David Lee should have been included on the special verdict form. On remand, David Lee's inclusion on Joseph Lee's special verdict form would indeed be appropriate provided there was some evidence that a "percentage or proportion of fault [is] attributable," *id.,* to him. Put another way,

such a special verdict form would be proper only if there is some evidence that David Lee was, at least in part, at fault. Indeed, if this were the case, the inclusion of David Lee on the special verdict form would be mandatory, if requested by any party.

¶ 62 To demonstrate fault, the evidence must be capable of proving that the individual or entity sought to be included on the special verdict form breached some duty owed to the party seeking recovery. Turning back to our example, to find David Lee at fault in some measure, the jury would have to find he owed a legal duty to Joseph Lee and breached that duty. In this manner, the trial court will ensure any damages awarded are properly apportioned.

### B. Waiver and Estoppel

¶ 63 Defendants submitted proposed jury instructions on the affirmative defenses of waiver and estoppel. They contended plaintiffs' actions, after learning of defendants' representation of parties with adverse interests, barred the lawsuit entirely. The trial court refused to give the proposed instructions, however, concluding they did not properly state the law of waiver and estoppel. Nevertheless, the court gave an instruction on the affirmative defense of informed consent. The court determined this instruction provided defendants with the substance of their affirmative defenses of waiver and estoppel. On appeal, defendants contend the trial court erred in refusing to give the jury any instruction on defendants' affirmative defenses of waiver and estoppel.

¶ 64 As an initial point, while we have not specifically addressed the question before, waiver and estoppel are widely considered appropriate defenses to a claim of legal malpractice. *See, e.g.,* 2 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice,* §§ 20.11 & 20.14, at 699–700, 717–20 (4th ed.1996) (stating that waiver and estoppel are proper defenses to legal malpractice and citing cases). We agree. Accordingly, defendants can properly rely on these defenses if there is evidence to support them. As we have earlier stated, "A party is entitled to have his theory of the case submitted to the jury, and where there is evidence to

support a party's theory of the case, it is error for the court to refuse to instruct thereon." *Goode v. Dayton Disposal, Inc.*, 738 P.2d 638, 640 (Utah 1987). Thus, on remand, if the evidence supports the defenses of waiver and estoppel, the trial court should instruct the jury regarding them.

¶ 65 At trial below, the trial court rejected defendants' proposed instructions on waiver and estoppel, finding they incorrectly stated the law.[12] Indeed, "the trial court may properly refuse to give [a] requested instruction[ ] where it does not accurately reflect the law governing the factual situation of the case." *Black v. McKnight*, 562 P.2d 621, 622 (Utah 1977). Yet, this should not overshadow the trial court's obligation to see that the jury is presented with "a party's theory of the case." *Goode*, 738 P.2d at 640. On remand, if this issue arises again, the trial court should require the proponent of the instruction to rewrite it to conform with the law governing the facts presented.

### C. Bases for Liability

¶ 66 The liability question before the jury was whether defendants had breached any fiduciary duty owed to the plaintiffs. Defendants argue the trial court improperly allowed the jury to choose between two alternative bases for finding defendants liable for a breach of fiduciary duty: (i) a breach of defendants' duty of loyalty or (ii) a breach of defendants' duty of confidentiality. They contend that proof of actual disclosure or misuse of confidential information is a prerequisite for a finding of a breach of the duty of confidentiality and that there is no such proof in this case. Accordingly, they contend, the jury should only have considered whether defendants breached the duty of loyalty.

¶ 67 In addressing this issue, we are guided by our earlier opinion in *Gildea v. Guardian Title Co. of Utah*, 970 P.2d 1265 (Utah

1998). In that case, we affirmed the trial court's summary judgment ruling that dismissed the plaintiff's tort claims against various defendants. *Id.* at 1272. Among those claims, was an accusation that one of the defendants had breached its duty of confidentiality to the plaintiff by allowing an attorney to view a confidential file related to the plaintiff. *Id.* at 1269–70. We concluded the defendant had no fiduciary duties to the plaintiff and further determined that, even if such duties existed, the plaintiff had presented no evidence at all that the defendant had breached its duty of confidentiality. *Id.* at 1270. The only evidence before the trial court was that the attorney had never, in fact, seen the relevant file. *Id.* While the attorney had used information that was in the file, he testified he had gained the information from another source, and the plaintiff did not contest that testimony. *Id.* Based on these facts we concluded that "without any evidence that [the defendant] communicated confidential information, [the plaintiff's contention] is pure speculation and conjecture which cannot be allowed to form the basis of a jury's verdict." *Id.*

¶ 68 As applied to this case, *Gildea* mandates that plaintiffs present some evidence that Wiley Rein and/or Richard Wiley actually communicated confidential information. For instance, in their dealings with Wood, several plaintiffs provided him with much confidential information about their financial positions. However, they also provided Northstar with financial information. To prove that Wiley Rein and/or Richard Wiley had actually breached the duty of confidentiality by providing Northstar with confidential information, plaintiffs must demonstrate that Northstar had financial information available to it beyond what plaintiffs had given it, financial information that only could have come from Wiley Rein and/or Richard Wiley.[13]

---

12. While irrelevant to the outcome of this appeal, we note that the trial court properly excluded the proposed instructions. Defendants' instructions failed to indicate that a party "cannot be presumed to have waived the right to object based on their alleged consent *when adequate disclosure of the effects of [a law firm's simultaneous] representation [of another party] was not made.*" *Margulies v. Upchurch*, 696 P.2d 1195, 1201 (Utah 1985) (emphasis added).

13. If Wiley Rein disclosed information to Northstar that Northstar already had from any of the plaintiffs, this cannot be the basis for a claim of breach of the duty of confidentiality because there is no harm. However, it may well be an ethical violation.

### D. Damages

¶ 69 David Schutz was the plaintiffs' sole expert witness on damages. At trial, Schutz presented two separate valuations of Channel 13. The first was based on the 1987 fair market value of Channel 13. Schutz estimated the 1987 value of the MWT, Ltd., limited partners' interest in Channel 13 at $10 million. The second estimate was based on the value of Channel 13 as it would have been in 1997 but for the alleged breaches of fiduciary duty by defendants. Under this estimate, the MWT, Ltd., limited partners' interest in Channel 13 was valued at $25 million.

¶ 70 The 1987 and 1997 appraisals were each based on a discounted cash flow analysis. Under this analysis, Schutz valued Channel 13 by projecting a hypothetical stream of profits over a ten year period.[14] The hypothetical profit streams reflected revenues less expenses, and the accumulated cash flow over the ten year period was discounted to present value. After arriving at discounted present value of the accumulated cash flows, Schutz applied a standard multiple (ten) to the estimated cash flow of the final year to determine a resale value, which was also discounted to present value. The discounted accumulated cash flow and the discounted resale value were then added together, resulting in Schutz's estimation of the fair market value of the Channel 13 license. In the 1987 estimate, this value was over $25 million, and, in the 1997 estimate, it was almost $61 million.

¶ 71 Plaintiffs contention at trial was that the damage they had incurred from defendants' tortious conduct was the loss of their forty percent interest in the Channel 13 license. Accordingly, Schutz calculated the damages from defendants' breaches as forty percent of the fair market value of the Channel 13 license, over $10 million in his 1987 estimate and over $24 million in his 1997 estimate.

### 1. Date for Determination of Damages

■ ¶ 72 Defendants contend the trial court erred in allowing the jury to determine plaintiffs' damages resulting from their loss of ownership in the station, i.e., lost owner-ship and lost cash distribution, as measured *either* from the date of defendants' alleged breaches of fiduciary duty or from the date almost a decade later when the case was ready for trial. We disagree. Defendants rely heavily on *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820 (2d Cir. 1990), a federal case interpreting New York contract law. The *Sharma* court stated as follows:

> Measuring ... damages by the value of the item at the time of the breach is eminently sensible and actually takes expected lost future profits into account. The value of assets for which there is a market is the discounted value of the stream of future income that the assets are expected to produce. This stream of income, of course, includes expected future profits and/or capital appreciation.

916 F.2d at 826. While such an approach may be appropriate in some cases, "the general objective of tort law [is] to place an injured person in a position as nearly as possible to the position he would have occupied but for the defendant's tort...." *Acculog, Inc. v. Peterson*, 692 P.2d 728, 731 (Utah 1984) (citing *State v. Stanley*, 506 P.2d 1284 (Alaska 1973)). We believe that the trial court is in the best position to determine what award of damages will make a plaintiff whole, and, thus, we are willing to permit the trial court to use its discretion in determining the date from which damages will be measured. *See Anchorage Asphalt Paving Co. v. Lewis*, 629 P.2d 65, 68 (Alaska 1981) ("Because the circumstances of individual cases differ drastically, it is impractical to adopt a definite point in time to value damages. It has been found preferable to leave the question to the trial court's discretion.").

■ ¶ 73 In this case, we conclude the trial court's decision was within its permitted range of discretion. By measuring damages at the time of trial, the jury was presented with estimates of the MWT, Ltd., limited partners' lost profits from 1987 to the expected trial date, 1997, as well as the potential fair market value of Channel 13 in 1997. We believe this evidence allowed the jury to

---

14. The market revenues prior to 1997 were primarily obtained from published information of the actual experience of several Salt Lake television stations.

come to a reasonable approximation of the damages the MWT, Ltd., limited partners actually incurred as a result of defendants' alleged breaches of fiduciary duty. Accordingly, the trial court's decision was within its permitted discretion.

### 2. Damages Based on Expert Estimates

¶ 74 In addition to arguing that the damages were calculated as of an improper date, defendants also contend the trial court erred in allowing the jury to award lost ownership and cash distribution damages based solely on the estimates of plaintiffs' expert witness, Schutz. We conclude the trial court did not err in this regard.

¶ 75 Part of the difficulty in addressing this issue is that, contrary to defendants' assertions, there was evidence apart from Schutz's testimony to support the jury verdict. The jury had before it several similar appraisals of Channel 13's value prepared by Wood, Northstar, Communications Partners, and Frazier, Gross & Kadlec. Even setting aside this evidence, however, we conclude Schutz's testimony is not insufficient as a matter of law.

[18–21] ¶ 76 "Lost profits must be established with reasonable certainty," *Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1165 (Utah 1983), or, in other words, with " 'sufficient certainty that reasonable minds might believe from a preponderance of the evidence that the damages were actually suffered.' " *Id.* (quoting *First Sec. Bank of Utah v. J.B.J. Feedyards, Inc.*, 653 P.2d 591, 596 (Utah 1982)); *see also Canyon Country Store v. Bracey*, 781 P.2d 414, 418 (Utah 1989). While start-up businesses, such as Channel 13, lack an actual record of past earnings, which decreases "the certainty with which one could predict future profits[,] ... that fact should not automatically preclude new businesses from recovering lost profits.... Rather, new businesses should be allowed to try to prove lost profits up to a reasonable level of certainty by other means...." *Cook*, 664 P.2d at 1166. One method of measuring damages in such a situation is by expert testimony. *Id.* at 1166 n. 4. While this may not be as precise as other methods of proof, nevertheless, "[o]nce a defendant has been shown to have caused a loss, he should not be allowed to escape liability because the

amount of the loss cannot be proved with precision.... Consequently, the reasonable level of certainty required to establish the amount of a loss is generally lower than that required to establish the fact or cause of a loss." *Id.* at 1166 (citations and emphasis omitted); *see also Price–Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.*, 784 P.2d 475, 478 n. 1 (Utah Ct.App.1989) ("While an award of damages based only upon speculation cannot be upheld, some degree of uncertainty in the evidence of damages will not relieve the defendant from compensating a wronged plaintiff."). Accordingly, "[t]he certainty requirement is met as to the amount of lost profits if there is sufficient evidence to enable the trier of fact to make a reasonable approximation." *Cook*, 664 P.2d at 1166.

 ¶ 77 Applying the above principles to the case at hand, we conclude Schutz's testimony was not inadequate as a matter of law to provide a basis for the jury's award of damages. Schutz used industry-accepted methods to calculate the potential value of Channel 13, and, in calculating Channel 13's potential market revenue prior to 1997, Schutz used estimates based on published information of actual Salt Lake television stations. While such expert testimony may not be as precise as calculations of actual revenue, it is, nevertheless, not inadequate as a matter of law. The testimony presented "sufficient evidence to enable the trier of fact to make a reasonable approximation." *Id.*

### 3. Cash Call

¶ 78 The jury concluded that MWT Corporation was the only plaintiff damaged as a result of Northstar's 1991 "cash call." Accordingly, the jury awarded MWT Corporation $184,000 in actual damages ($92,000 against Richard Wiley and $92,000 against Wiley Rein) and $150,000 in punitive damages against Richard Wiley. Defendants contend the trial court erred in allowing the jury to award MWT Corporation any damages for Northstar's 1991 cash call. We agree.

¶ 79 It is undisputed that MWT Corporation never incurred any actual financial loss as a result of the cash call. Plaintiffs contend, however, that the cash call is a legal

obligation caused by defendants' breach of fiduciary duties, and, therefore, they are entitled to damages. *See Wilson v. S. Pac. Co.,* 13 Utah 352, 44 P. 1040, 1042 (1896) (allowing jury to award damages where plaintiff incurred a legal obligation as yet unpaid). We disagree with this characterization of the cash call. Northstar's cash call is better described as setting forth Northstar's view that the MWT, Ltd., limited partners had a legal obligation, a view these plaintiffs disputed. However, as Northstar has done nothing to create such an obligation, none exists. Accordingly, on remand, absent new evidence that would support the characterization of the cash call as a legal obligation, it would be inappropriate for plaintiffs to be awarded damages on this basis.

### III. ARGUMENTS OF RICHARD WILEY

¶ 80 In addition to the issues he raises above with Wiley Rein, Richard Wiley contends the trial court erred in (1) allowing the jury to find he had an attorney-client relationship with MWT Corporation, (2) allowing the jury to award actual damages based on the cash call, and (3) allowing the jury to award punitive damages based on the cash call. We conclude that the jury could properly find an attorney-client relationship between Richard Wiley and MWT Corporation; however, the jury should not have awarded actual and punitive damages against Richard Wiley based on the cash call.

#### A. *Attorney–Client Relationship*

¶ 81 Richard Wiley contends the jury verdict cannot be upheld against him because no attorney-client relationship existed between himself and MWT Corporation. He argues he had no personal attorney-client relationship with MWT Corporation even if MWT Corporation was a client of Wiley Rein. We disagree.

¶ 82 Where a law firm represents a client, each individual attorney within the firm generally has an attorney-client relationship with that client. Indeed, as one court notes, "It is axiomatic that the employment of a law firm is the employment of all members of that firm unless there is a special understanding otherwise." *Knight v. Guzman,* 291 Ill.App.3d 378, 225 Ill.Dec. 677, 684 N.E.2d 152, 154 (1997); *see also Streit v. Covington & Crowe,* 98 Cal.Rptr.2d 193, 196, 82 Cal.App.4th 441, 445 (4th Dist.2000) (stating that "by retaining a single attorney, a client establishes an attorney-client relationship with any attorney who is a partner of or is employed by the retained attorney"); *Burton v. Estrada,* 149 Ill.App.3d 965, 103 Ill. Dec. 233, 501 N.E.2d 254, 258 (1986) ("[W]hen a client hires an attorney in a partnership the presumption is that he or she has hired the other attorneys in the firm as well, unless there is an agreement otherwise."). In this case, Richard Wiley presents no reason, such as an explicit agreement otherwise, as to why we should conclude he had no attorney-client relationship with the plaintiffs. Thus, if Wiley Rein had an attorney-client relationship with MWT Corporation, Richard Wiley did as well.[15]

#### B. *Cash Call Damages*

1. Actual Damages

¶ 83 As noted above, the cash call did not create a legal obligation. It merely reflected Northstar's belief that such an obligation existed. This, in turn, was disputed by the MWT, Ltd., limited partners, and nothing further occurred. Accordingly, we conclude the trial court erred in allowing the jury to award MWT Corporation actual damages from Richard Wiley personally for Northstar's 1991 cash call.

---

**15.** Nevertheless, the jury's verdict was based on Richard Wiley's alleged relationship with MWT Corporation at the time of the cash call in December 1991. Plaintiffs contend that Richard Wiley had an implied attorney-client relationship with MWT Corporation at that time because MWT Corporation was a limited partner of MWT, Ltd. However, as set out in our prior discussion, the trial court's interpretation of what constitutes an implied attorney-client relationship under *Margulies* was improper. Accordingly, on remand, for the fact-finder to conclude an implied attorney-client relationship between Richard Wiley and MWT Corporation, MWT Corporation must have reasonably believed that Wiley Rein and/or Richard Wiley was its attorney.

## 2. Punitive Damages

 ¶ 84 Having determined there was no proper basis for an award of actual damages, we now address the award of punitive damages for the cash call. Under Utah law, if there are no actual damages, an award of punitive damages is improper. *See Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 337 (Utah 1985). As there was no proper award of actual damages for the cash call, an award of punitive damages would be inappropriate.

## IV. CROSS–APPEAL

 ¶ 85 Recognizing the possibility of reversal, plaintiffs, in addition to filing a responsive brief, filed a conditional cross-appeal.[16] They contend the trial court erred in (1) refusing to rule as a matter of law that Richard Wiley had an attorney-client relationship with those plaintiffs who were found to be Wiley Rein clients, (2) ruling Richard Wiley's indemnity agreements with Allstate were subject to rule 411 of the Utah Rules of Evidence, and (3) excluding the expert report and testimony of Albin Seethaler.

### A. Attorney–Client Relationship

¶ 86 The first issue on cross-appeal is whether the trial court erred in refusing to rule as a matter of law that Richard Wiley had an attorney-client relationship with those plaintiffs who were found to be Wiley Reins' clients. We conclude the trial court erred on this point.

¶ 87 Defendants contend that while Richard Wiley did owe fiduciary duties to the plaintiffs represented by Wiley Rein, nevertheless, he did not personally have an attorney-client relationship with these parties. We disagree. As stated above, if Wiley Rein represents a client, each individual attorney within the firm generally has an attorney-client relationship with that client. *Knight*, 225 Ill.Dec. 677, 684 N.E.2d at 154; *see also Streit*, 98 Cal.Rptr.2d at 196, 82 Cal.App.4th

at 445; *Burton*, 103 Ill.Dec. 233, 501 N.E.2d at 258. Therefore, absent an agreement otherwise, it would be proper for the trial court to rule that, as a matter of law, Richard Wiley had an attorney-client relationship with those plaintiffs who were found to be Wiley Rein's clients.

¶ 88 We also disagree with defendants' claim that our conclusion creates a danger of a dual recovery by the plaintiffs. Rather than a dual recovery, this allows the jury to assign a percentage of any fault they find for the actions personally taken by Richard Wiley as opposed to those of the remainder of the Wiley Rein partnership. It does not increase the total amount of damages. Accordingly, we conclude the trial court erred in refusing to rule as a matter of law that Richard Wiley had an attorney-client relationship with those plaintiffs who were found to be Wiley Rein's clients.

### B. Admissibility of the Indemnity Agreement

¶ 89 In 1989, Allstate entered an agreement with Richard Wiley in which, among other things, it agreed to indemnify Richard Wiley for any judgment against him as a result of his actions as a director of Northstar. This agreement was later amended to include indemnification of Wiley Rein for any losses it incurred as a result of this particular lawsuit. Plaintiffs attempted to proffer the amended indemnity agreement into evidence at trial. In response, defendants moved to exclude the evidence, arguing it was barred by rules 411 and 403 of the Utah Rules of Evidence. The trial court disagreed with defendants and ruled that the amended indemnity agreement was admissible; however, the trial court stated that "reference to such information may not be used to demonstrate the parties acted negligently or otherwise wrongfully, but rather to demonstrate control, bias, prejudice, etc."

---

16. Defendants contend any conditional cross-appeal is improper. We disagree. We have already recognized the validity of filing a cross-appeal that is conditioned on this court's decision regarding issues on appeal in *Pepper v. Zions First Nat'l Bank, N.A.*, 801 P.2d 144 (Utah 1990), and see no reason to depart from this procedure. The presentation of additional issues on cross-

appeal in this case has not added any confusion to the appellate process. Rather, the issues on cross-appeal are clearly defined and separated from the issues raised by defendants. Further, consideration of the conditional cross-appeal at this point promotes judicial economy by allowing us to give guidance to the trial court on remand.

¶ 90 On appeal, plaintiffs contend the trial court erred in limiting the purposes for which the indemnity agreement could be used at trial. Specifically, plaintiffs argue the trial court erred in ruling that the indemnity agreements were subject to rule 411 of the Utah Rules of Evidence. Rule 411 provides as follows:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

Utah R. Evid. 411. In fact, the trial court specifically stated that rule 411 was inapplicable, and neither party, on appeal, argues this was incorrect. Nevertheless, as the plaintiffs correctly point out, the court did rely on the language and principles of rule 411 in limiting the purposes for which the evidence of the amended indemnity agreement was admissible.

¶ 91 Although the trial court did not specifically state that its ruling was based on rule 403, the record clearly implies that this was the case. On appeal, our review of a trial court's rule 403 rulings is limited to a determination of whether the trial court exceeded its permitted discretion. *See State v. Nelson–Waggoner*, 2000 UT 59, ¶ 28, 6 P.3d 1120. Accordingly, the issue now before us is whether the trial court exceeded its permitted discretion in ruling the indemnity agreements were admissible only for certain purposes.

¶ 92 Rule 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Utah R. Evid. 403. In this case, the amended indemnity agreement was probative of defendants' biases and prejudices in dealing with plaintiffs. It suggests defendants' bias to act on behalf of other clients at plaintiffs' expense. However, this very fact serves to make the agreement prejudicial, as well. In weighing these competing interests, the trial court opted for a middle ground, allowing the evidence to be admitted, but only for limited purposes. We believe the trial court's determination to use the principles of rule 411 in tempering the admissibility of the agreements under rule 403 was within its permitted discretion.

### C. Expert Report and Testimony

¶ 93 To prove damages due to defendants' legal malpractice, plaintiffs intended to call Albin Seethaler as an expert witness in addition to Schutz. The trial court determined that plaintiffs could call both as expert witnesses. Seethaler's report and testimony were to provide an alternative damage theory at trial. Seethaler's estimate of damages was based on a 1998 appraisal of Fox-owned Channel 13. In that appraisal, Seethaler valued Channel 13 at over $149 million. Seethaler concluded this figure provided a measure of the plaintiffs' lost opportunity value due to breaches of fiduciary duty by defendants in 1990.

¶ 94 During trial, however, the trial court reversed its previous ruling and declared Seethaler's testimony inadmissable. The trial court concluded it was irrelevant. Plaintiffs contend the trial court erred in excluding the expert report and testimony of Albin Seethaler. We disagree.

¶ 95 "The trial court is 'granted broad discretion in determining the relevance of proffered evidence,' and we review the trial court's decision for abuse of that discretion." *Slisze v. Stanley–Bostitch*, 1999 UT 20, ¶ 17, 979 P.2d 317 (quoting *Hall v. Process Instruments & Control*, 890 P.2d 1024, 1028 (Utah 1995)).

¶ 96 Seethaler's calculation of damages began by calculating the actual value of the Fox-owned Channel 13 as of January 1, 1998, well after the purchase of Channel 20. Seethaler deemed the value of Channel 13 to be $149.5 million. This evidence was offered to demonstrate the business opportunity lost as a result of the breaches of fiduciary duty by defendants that occurred during 1990 when Channel 13 was sold to Fox. Seethaler was prepared to testify that Channel 13 would have been worth at least that amount

or more had the sale not been made. The trial court, however, found this evidence inadmissible. We conclude the trial court acted within its permitted discretion in so ruling.

 ¶ 97 "[T]he general objective of tort law [is] to place an injured person in a position as nearly as possible to the position he would have occupied but for the defendant's tort...." *Acculog, Inc. v. Peterson*, 692 P.2d 728, 731 (Utah 1984) (citing *State v. Stanley*, 506 P.2d 1284 (Alaska 1973)). Were a jury to award damages based on Seethaler's evidence, however, it would place the plaintiffs in a position they only would have occupied because of alleged breaches that occurred before the station's sale in 1990 to Fox. For instance, it ignores the fact that key to the 1990 sale was the prior purchase of Channel 20 by MWT, Ltd., from Adams, which plaintiffs decry as stemming from defendants' breach of fiduciary duties. Such a verdict would provide the plaintiffs an improper windfall by granting them financial advantages they would not have received without the alleged tortious conduct of defendants prior to the 1990 sale of Channel 13 to Fox.

¶ 98 We conclude that such an approach undermines the proper purpose of tort damages. It allows plaintiffs to distort the damages to their best advantage by ignoring breaches of fiduciary duties that actually worked to their benefit. For instance, Seethaler's estimation of damages ignores plaintiffs' claim that the purchase of Channel 20 by MWT, Ltd., constituted a breach of fiduciary duty; however, it is pure speculation that Fox would have purchased Channel 13 and that Channel 13's value would be equal to the reported value in 1997, as suggested by Seethaler, absent the purchase of Channel 20, which provided Channel 13 with the necessary equipment and programming to go on the air. Put another way, by only focusing on certain alleged breaches of fiduciary duties, Seethaler's testimony fails to provide the jury with a basis for determining a reasonable approximation of damages in this case. Accordingly, we conclude the trial court's ruling was within its permitted discretion.

## CONCLUSION

¶ 99 Having concluded the trial court committed reversible error in interpreting *Margulies v. Upchurch*, 696 P.2d 1195 (Utah 1985), we reverse the judgment entered below. We remand this case for proceedings consistent with this opinion.

¶ 100 Chief Justice Howe, Associate Chief Justice Russon, Justice Wilkins, and Judge West concur in Justice Durrant's opinion.

¶ 101 Having disqualified herself, Justice Durham does not participate herein; District Judge W. Brent West sat.