2002 UT 84

**Suzanne RODERICK, Plaintiff,**

v.

**Nathan RICKS; B. Ray Zoll; Douglas T. Castleton; Abaco Publishing, a Utah limited liability company; Abaco Installers, a Utah limited liability company; and John Does I–X, Defendants.**

**Douglas T. Castleton, Cross-claim Plaintiff and Appellant,**

v.

**B. Ray Zoll, Cross-claim Defendant and Appellee.**

No. 20000452.

Supreme Court of Utah.

Aug. 13, 2002.

John T. Anderson, Salt Lake City, attorney for plaintiff.

Steven C. Tycksen, Cory D. Memmott, attorneys for defendant.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶1 Douglas Castleton sued attorney B. Ray Zoll for legal malpractice, claiming that Zoll breached fiduciary duties he owed to Castleton when he represented a third party against Castleton. Following a bench trial, the trial court found in favor of Zoll, concluding that Zoll neither breached any fiduciary duties nor proximately caused the damages that Castleton claimed. Castleton appeals. Because the trial court correctly concluded that Zoll's representation of the third party did not breach any fiduciary duties Zoll owed to Castleton, we affirm.

## BACKGROUND

¶2 Unless otherwise stated, the following background information is either undisputed or taken from the trial court's detailed findings of fact. "On appeal from a bench trial, '[f]indings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.'" *Tanner v. Carter*, 2001 UT 18, ¶2, 20 P.3d 332 (quoting Utah R. Civ. P. 52(a)). "We relate the facts accordingly, granting due deference to the trial court's resolution of factual disputes." *Id.*

### I. ZOLL'S REPRESENTATION OF CASTLETON

¶3 B. Ray Zoll served as Douglas Castleton's attorney in three legal matters. According to Zoll, he and Castleton did not have a written agreement defining the scope of the representation in any of the three matters.

### A. Bankruptcy and Debt Collection Matters

¶ 4 Two of the matters in which Zoll represented Castleton concerned a bankruptcy action and a debt collection case. In early 1994, Zoll appeared on Castleton's behalf in bankruptcy court for the limited purpose of arguing a motion for relief from a bankruptcy court order. After this hearing, the bankruptcy court entered a final order on May 24, 1995, and no appeal was taken. In January 1995, Zoll filed an answer for Castleton in a debt collection case. This case was dismissed on June 13, 1995. The parties do not dispute that Zoll's representation of Castleton in the bankruptcy and collection matters ended before Zoll began representing Ricks against Castleton.

### B. Post–Divorce Matter

¶ 5 Zoll also represented Castleton in a post-divorce action. This representation began in February 1994, when Zoll defended Castleton at a contempt proceeding arising from Castleton's failure to stay current in his child support obligations. Then, in October 1994, Zoll represented Castleton at a hearing on Castleton's ex-wife's petition to modify their divorce decree. Afterwards, Castleton's ex-wife submitted a proposed order modifying the original divorce decree. Zoll filed an objection to this proposed order in February 1995. The divorce court scheduled a hearing on Zoll's objection for May 1, 1995, but later struck this hearing date. Zoll testified at trial that he vaguely recalled that he and Castleton had an understanding that the objection would not be pursued. Although Zoll did not file a notice of withdrawal as counsel of record in the post-divorce matter until November 1996, Castleton admitted at trial that Zoll did not perform further legal work for him after Zoll filed the objection to the proposed order.

## II. COMMUNICATIONS BETWEEN ZOLL AND CASTLETON

### A. August 2, 1995, Letter and Related Communications

¶ 6 When Castleton became delinquent on his bill for Zoll's legal services, Zoll sent Castleton a letter dated August 2, 1995, which stated as follows:

> I will accept a 15% reduction in the amount of your bill if it is paid in cash within two (2) weeks from the date hereof. In any event, if you do not make arrangements with our office to begin payment on your bill within (2) weeks from the date hereto, I will have no other option but to withdraw as your counsel in the matters for which this law firm has represented you and to pursue collection of this amount from you.

¶ 7 At trial, the parties disputed whether Castleton complied with the conditions stated in this delinquency letter. The first dispute concerned a payment of $100 Castleton made to Zoll's firm after receiving the letter. Castleton's check for $100 was dated September 19, 1995, over four weeks after the date Zoll had indicated he would withdraw as Castleton's attorney if Castleton had failed to make arrangements to begin paying his bill. Zoll maintained that because Castleton did not tender the $100 until after the attorney-client relationship terminated, the $100 was simply a payment on Castleton's legal bill.

¶ 8 Zoll and his law firm's secretary also testified that Castleton never contacted the firm to make arrangements to pay his bill as called for in the letter. Contradicting this testimony, Castleton testified that after receiving the letter, he met with Zoll and Zoll agreed to continue to represent him; Zoll denied that this meeting occurred. The trial court, which specifically noted that Castleton was not a credible witness, found that no such meeting took place.

¶ 9 Castleton further testified that Zoll agreed to accept as either partial or complete payment of his legal bill various printing services, and that, in accordance with this agreement, he prepared handouts, printouts, and other materials, then delivered them to a third party for delivery to Zoll. The third party testified that he neither knew of any such arrangement nor received any materials from Castleton on Zoll's behalf. Castleton also testified that in March 1996, Zoll sent a runner to Castleton's residence to pick up some materials related to a multi-level mar-

keting organization.[1] Castleton claimed that Zoll had agreed to reduce Castleton's legal bill in exchange for these materials. Zoll denied having made this agreement. The trial court found that Zoll had not agreed to accept printing services from Castleton in payment of his legal bill, and that Castleton had not delivered any materials to the third party for delivery to Zoll.

### B. April 1996 Billing Statement

¶ 10 In conjunction with Castleton's testimony regarding the runner, Castleton's attorney introduced into evidence a billing statement that Castleton had received from Zoll's firm.[2] This billing statement, which was dated April 1, 1996, itemized charges as follows:

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
|  | Professional services |  |  |
| 03/21/96 | Runner fees to pick up books | 1.00 10.00/hr | 10.00 |
|  | For professional services | 1.00 | $ 10.00 |
|  | Additional charges: |  |  |
| 03/21/96 | Runner fees |  | 7.00 |
|  | Total costs |  | $ 7.00 |
|  | Interest on overdue balance |  | $ 71.11 |
|  | Total amount of this bill |  | $ 88.11 |
|  | Previous balance |  | $4,651.67 |

¶ 11 Castleton testified that he interpreted the charges in the billing statement as being for services performed by Zoll's firm, not by Zoll himself.

### III. ZOLL'S REPRESENTATION OF NATHAN RICKS AGAINST CASTLETON

#### A. Castleton's Meeting with Zoll and Ricks

¶ 12 In April 1996, Zoll telephoned Castleton and asked him to come to Zoll's office to meet with Zoll and Nathan Ricks, a long-time client of Zoll's, about Castleton's employment relationship with Ricks's company.[3] Zoll did not tell Castleton in advance that he and Ricks intended to confront Castleton with an allegation that he had stolen money from Ricks. The meeting between Zoll, Castleton, and Ricks occurred April 8, 1996.

¶ 13 Zoll tape-recorded a portion of this meeting. A transcript, which the trial court certified as accurate, shows Zoll accusing Castleton of submitting false invoices to Ricks, and Castleton admitting to having done so:[4]

Zoll: Alright Doug, ... I want it to get clean here, okay. I want to clean this deal up. Right now, I'm recording ... this little conversation. This is your chance to try to make due [sic] with what appears to me to be a really sensitive, ugly, little situation. I've just shown you these billings, like the Publisher's Assistant. Did you make that [billing] up off your computer and pad it?

Castleton: Yes I did.

Zoll: And you padded it and sent it over to Nathan?

1. Zoll testified that he and Castleton were members of a multi-level marketing organization and that he had looked at some materials that Castleton had produced related to the organization. However, Zoll denied any relationship between this and any legal matter related to Castleton or the payment of Castleton's legal bill.

2. Castleton testified that he received this statement on approximately April 7, 1996, after returning from a trip to Las Vegas.

3. Castleton maintains that he and Ricks had an independent contractor relationship, not an employment relationship. Since this distinction has no bearing on the outcome of this case, we use the district court's terminology.

4. The trial court noted that by falsifying records, Castleton obtained tens of thousands of dollars from Ricks's company.

Castleton: It's for labor that I did but Publisher's Assistant didn't do it.

Zoll:.... Is there even such a thing as Publisher's Assistant?

Castleton: No.

[Under further questioning from Zoll, Castleton admits to falsifying company letterhead and a bill.]

Zoll: You knew that you were getting paid for that?

Castleton: Yes.

. . . .

Zoll: Why did you do that Doug?

Castleton: Just didn't have enough money to make ends meet?

Zoll: Pressure from your ex?

Castleton: (inaudible)

Zoll: Pressure from Suzette?

Ricks: Suzanne.

Zoll: Suzanne? Did the same thing happen on most of the invoices that you went through? Were they padded too?

Castleton: (inaudible) They were (?)

[Zoll then attempts to determine how much Castleton generally padded invoices.]

Castleton: I really didn't use a rule of thumb.

Zoll: Just if you needed a little extra money you padded some of it?

Castleton: I did.

Zoll: You know I represent Nathan in this situation I guess don't you?

Castleton: Are you representing me too?

Zoll: I represented you in your divorce. I have nothing to do with that in this case.

Castleton: Well I just want to make it right so....

Zoll: Are you willing to try to make this right?

Castleton: Yes.

Zoll: You realize that this is criminal conduct?

Castleton: No I didn't realize it.

### B. Ricks's Seizure of Property from Castleton

¶ 14 Later during this meeting, Castleton and Ricks agreed that Ricks would follow Castleton to his residence that evening to obtain whatever computer hardware and software were necessary to preserve the data that Castleton had obtained during his employment with Ricks's company. They also agreed that Ricks would obtain from Castleton other property to hold as security for some of the money that Castleton had stolen from Ricks.

¶ 15 When Ricks and Castleton went to Castleton's residence that evening, Ricks took possession of his company's data and the items that he and Castleton had agreed would serve as security. Ricks also took possession of electronic equipment and other items beyond that originally contemplated in the meeting at Zoll's office. However, Castleton consented to this seizure of additional property and even helped load the property into Ricks's vehicles. Zoll did not accompany Castleton and Ricks to Castleton's home.

¶ 16 On April 9, 1996, Zoll sent a letter to Castleton notifying him of his immediate termination from Ricks's company. The letter also confirmed that Zoll represented Ricks and his company and that Castleton had consented to the security arrangement:

This notice [of termination] is given for cause as described in the meeting at the offices of Zoll and Branch [Zoll's law partner] acting as attorneys for Nathan Ricks and [his company] whereon a variety of improprieties have occurred by you [sic].
. . . .

Pursuant to our understanding and as you have consented we have picked up and caused to be delivered to [Ricks's company] certain equipment, files, software, furnishings and the like from your apartment to be held [in Ricks's company's offices] pending our further investigation of the amount of money that has been inappropriately obtained by you.

¶ 17 On April 19, 1996, Castleton and Ricks signed an agreement prepared by Zoll in which Castleton admitted that he (1) was indebted to Ricks's company for money he had obtained by falsifying invoices and (2) consensually gave "certain property" to Ricks as security for the amount owed. For his part, Ricks agreed that, upon execution of

the agreement, he would return a portion of the property he had obtained from Castleton. Castleton claimed that much of this property was either not returned by Ricks, or was returned damaged.

¶ 18 Castleton later pleaded guilty to one count of Class A misdemeanor theft related to the money he stole from Ricks's company.

### III. CASTLETON SUES ZOLL FOR MALPRACTICE

¶ 19 Following the April 19 agreement, Castleton's fiancée, Suzanne Roderick, filed suit against Ricks, Zoll, and Castleton, claiming an unperfected security interest in a substantial amount of the property taken by Ricks as security. Castleton cross-claimed against Zoll, claiming that Zoll had breached fiduciary duties arising from their attorney-client relationship and that these breaches of duty proximately caused the losses related to Ricks's seizure of his property.

¶ 20 Castleton presented the district court two alternative theories under which Zoll was allegedly liable to Castleton for legal malpractice. First, Castleton argued that, at the time Zoll confronted him about the theft and "facilitated" Ricks's seizure of his property, Zoll remained Castleton's attorney in the post-divorce matter. Zoll's adverse representation, claimed Castleton, therefore breached the fiduciary duties of loyalty a lawyer owes a current client.

¶ 21 Castleton's alternative theory relied on the premise that, even after an attorney-client relationship terminates, a lawyer owes the former client continuing fiduciary duties of confidentiality and loyalty. The continuing duty of loyalty, maintained Castleton, obligated Zoll to refrain from representing Ricks against him because the matter was substantially factually related to Zoll's former representation of Castleton.

¶ 22 The trial court, sitting as trier of fact, heard testimony from, among others, Zoll, Castleton, and legal experts retained by the parties. The trial court noted "substantial internal inconsistencies in Castleton's testimony and glaring contradictions between his testimony and that of other more independent and objective witnesses." The court specifically found Castleton not to be a "credible witness."

¶ 23 After taking the case under advisement, the court rejected both of Castleton's theories under which Zoll allegedly breached fiduciary duties. Regarding Castleton's first theory, the trial court concluded that Castleton could not claim that Zoll breached fiduciary duties owed to him as a current client because the attorney-client relationship ended when Castleton failed to comply with the terms of the delinquency letter. In reaching this conclusion, the court noted that Zoll's expert, a respected member of the bar, had testified that there was no attorney-client relationship between Zoll and Castleton at the time of the April 1996 meeting with Ricks.

¶ 24 The trial court also rejected Castleton's second theory, that Zoll breached his continuing duty of loyalty to Castleton as a former client. In so doing, the trial court concluded that the bankruptcy, collection, and post-divorce matters in which Zoll had previously represented Castleton were not substantially factually related to the matter in which Zoll represented Ricks. The court also concluded that Zoll did not breach the continuing duty of confidentiality, noting that Castleton failed to provide any evidence that Zoll obtained confidential information during his representation of Castleton.

¶ 25 In further support of its judgment in favor of Zoll, the court determined that Castleton failed to show that Zoll either actually or proximately caused Castleton's damages. Specifically, while acknowledging that Zoll had facilitated the arrangement whereby Ricks obtained property from Castleton as security, the court concluded that Zoll had nothing to do with Ricks's seizure of additional property and could not foresee that Ricks would retain or damage the property.

¶ 26 Accordingly, the trial court ruled in favor of Zoll. Castleton appeals this ruling, and we now affirm.

### STANDARD OF REVIEW

¶ 27 When reviewing a bench trial, appellate courts may not set aside a trial court's

findings of fact "unless clearly erroneous."[5] Utah R. Civ. P. 52(a). To successfully demonstrate that a factual finding is clearly erroneous, the appellant must marshal all the evidence in favor of the factual finding and show that, even when viewed in the light most favorable to the trial court's factual finding, the favorable evidence is insufficient to support the finding. *Tanner*, 20 P.3d 332, 2001 UT 18 at ¶ 17; *State v. Robertson*, 932 P.2d 1219, 1223–24 (Utah 1997). Moreover, in assessing whether a finding is clearly erroneous, reviewing courts must give "due regard ... to the opportunity of the trial court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a).

¶ 28 In contrast, when reviewing the trial court's conclusions of law, appellate courts apply a correction-of-error standard without any special deference. *W. Kane County Special Serv. Dist. No. 1 v. Jackson Cattle Co.*, 744 P.2d 1376, 1377–78 (Utah 1987).

## ANALYSIS

■ ¶ 29 "The essential elements of legal malpractice based on breach of fiduciary duty include the following: (1) an attorney-client relationship; (2) breach of the attorney's fiduciary duty to the client; (3) causation, both actual and proximate; and (4) damages suffered by the client." *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1290 (Utah Ct.App.1996) (hereinafter "*Kilpatrick I*").

¶ 30 On appeal, Castleton claims the trial court erred in concluding that he did not prove any of the first three elements of legal malpractice. Specifically, Castleton claims that, contrary to the trial court's conclusions, (1) Zoll owed him a fiduciary duty of loyalty based on either a continuing or former attorney-client relationship;[6] (2) Zoll breached

this duty of loyalty during his representation of Ricks by, among other things, inducing Castleton to permit Ricks to seize Castleton's personal property as security; and (3) this breach of duty proximately caused the loss of personal property. We affirm the trial court's judgment in favor of Zoll on the grounds that Castleton has failed to demonstrate a breach of a fiduciary duty.

## I. WHETHER ZOLL OWED CASTLETON A FIDUCIARY DUTY OF LOYALTY BASED ON EITHER A CURRENT OR FORMER ATTORNEY–CLIENT RELATIONSHIP

¶ 31 Castleton maintains that Zoll's adverse representation of Ricks violated Zoll's fiduciary duty of loyalty to Castleton. Specifically, Castleton argues that Zoll violated this duty of loyalty because (1) Zoll remained Castleton's attorney in the post-divorce matter, and (2) alternatively, even if Zoll no longer represented him, the matters in which Zoll previously represented Castleton were substantially factually related to Zoll's representation of Ricks. We address each of these arguments in turn.

### A. Duty of Loyalty Based on the Theory that Zoll's and Castleton's Attorney–Client Relationship in the Post–Divorce Matter Continued During Zoll's Representation of Ricks

■ ¶ 32 During an attorney-client relationship, an attorney owes a client a fiduciary duty of loyalty, which requires the attorney "to exercise impeccable honesty, fair dealing, and fidelity" in dealings with the client. *Id.* An attorney-client relationship exists when the client reasonably believes the attorney represents the client's legal interests. *See Kilpatrick v. Wiley, Rein & Fielding*, 2001

---

5. Castleton maintains that we should apply a less deferential standard of review in light of *Houghton v. Department of Health*, 962 P.2d 58 (Utah 1998), which held that "to the extent this Court has a special interest in administering the law governing attorney ethical rules, a trial court's discretion is limited." *Id.* at 61. By its terms, *Houghton's* holding was limited to cases governed by ethical rules. Since the common law of malpractice governs the instant case, we reject Castleton's argument.

6. Although Castleton asserts the trial court erred in concluding Zoll did not breach his continuing duty of confidentiality, Castleton has not adequately supported his assertion with either legal argument or shown that the trial court clearly erred in finding that Zoll did not obtain confidential information from Castleton. Accordingly, we affirm the trial court's conclusion and ancillary factual findings related to the duty of confidentiality.

UT 107, ¶ 40, 37 P.3d 1130 (hereinafter *Kilpatrick II* ”); *see also In re Weiner,* 120 Ariz. 349, 586 P.2d 194, 197 (1978) (stating that attorney-client relationship terminates when the "client clearly understands, or reasonably should understand, that the relationship is no longer to be depended on").

¶ 33 The trial court concluded that Zoll's attorney-client relationship with Castleton ended when Castleton failed to make arrangements to pay his bill as per the August 1995 delinquency letter. Moreover, the court expressly concluded that at the time of the meeting with Ricks, Castleton neither subjectively believed nor reasonably could have believed that Zoll was his attorney. Castleton challenges the trial court's conclusions on the grounds that (1) Zoll failed to obtain the divorce court's permission to withdraw as required by Rule 4–506 of the Utah Rules of Judicial Administration, and (2) Zoll's demand letter and other conduct were too equivocal to sever the attorney-client relationship.

1. Withdrawal Requirements under Rule of Judicial Administration 4–506

¶ 34 Castleton's first argument relies on the fact that, at the time of the meeting with Ricks, the divorce court had yet to rule on an objection Zoll had filed in divorce court fourteen months prior to the meeting. Specifically, Castleton points out that until the divorce court ruled on Zoll's objection, Utah Rule of Judicial Administration 4–506(1) required Zoll to obtain the court's permission before withdrawing as counsel of record.[7] Thus, Castleton continues, Zoll's failure to formally withdraw as counsel of record until well after the meeting with Ricks conclusively demonstrates that their attorney-client relationship remained intact during that meeting. We disagree.

¶ 35 Although we have not yet considered this particular issue, interpretations of similar rules by other courts do not support Castleton's theory. Specifically, the case

law associated with such rules suggests that when an attorney terminates representation in a situation where a rule required the attorney to obtain the court's permission before withdrawing, the attorney may have withdrawn wrongfully. *See, e.g., Kingdom v. Jackson,* 78 Wash.App. 154, 896 P.2d 101, 104 (1995) (noting that Washington's withdrawal procedure permits court to consider whether, inter alia, an attorney's withdrawal would unduly prejudice client). Castleton is not claiming damages related to Zoll's failure to pursue the motion, however, but rather damages related to Zoll's subsequent representation of another party. In this regard, the pertinent case law does not foreclose the possibility that an attorney who withdraws without the court's permission can, at the same time, make it clear to the client that he or she can no longer depend on the relationship and, by so doing, avoid a breach of the duty of undivided loyalty should the attorney later represent an adversary in another legal matter. *See, e.g., Wozniak v. Tonidandel,* 121 Ohio App.3d 221, 699 N.E.2d 555, 558 (1997) (holding that attorney-client relationship ended when client understood from termination letter that attorney no longer represented him, and rejecting claim that relationship did not end until court later granted attorney's motion to withdraw).

¶ 36 In short, Castleton has not persuaded us that the narrow inquiry of whether Zoll complied with rule 4–506 should replace the broader inquiry generally used to determine the existence of an attorney-client relationship: i.e., whether the client reasonably believes the attorney represents the client's legal interests. *See Kilpatrick II,* 2001 UT 107 at ¶ 40, 37 P.3d 1130. Certainly, a client's knowledge that his or her attorney has filed a motion on the client's behalf and has not withdrawn as counsel of record may factor into a court's assessment as to whether, under the totality of the relevant circumstances, a client reasonably believes that the attorney continues to represent his or her

---

7. Utah Rule of Judicial Administration 4–506(1) provides as follows:

(1) Withdrawal requiring court approval. Consistent with the Rules of Professional Conduct, an attorney may withdraw as counsel of

record only upon approval of the court when a motion has been filed and a court has not issued an order on the motion.... Under these circumstances, an attorney may not withdraw except upon motion and order of the court.

interests. However, Castleton does not claim that, at the time of the meeting with Ricks, he knew of Zoll's failure to withdraw. In addition, the trial court had before it (1) Zoll's testimony that he and Castleton had an understanding that the motion in divorce court would not be pursued,[8] and (2) Castleton's testimony that Zoll did not perform legal work for him in the fourteen months between filing the objection in divorce court and representing Ricks.

¶ 37 We therefore conclude that the trial court appropriately rejected Castleton's theory that Zoll's failure to obtain permission to withdraw as counsel of record conclusively demonstrated that Castleton could reasonably rely on Zoll's undivided loyalty.[9] Rather, the trial court properly based its determination on whether Castleton reasonably believed that Zoll continued to represent him.

¶ 38 We next consider Castleton's challenges related to this determination.

2. Whether Castleton Reasonably Believed That Zoll Continued to Represent His Legal Interests

■ ¶ 39 In challenging the trial court's conclusion that Castleton did not reasonably believe Zoll represented him during the meeting with Ricks, Castleton argues that Zoll's delinquency letter and the billing statement for "professional services" supported a reasonable belief that the attorney-client relationship in the divorce matter had not terminated. We affirm the trial court's finding because, as shown below, Castleton has failed

to show the trial court clearly erred in finding that Castleton did not subjectively believe that Zoll represented him.

■ ¶ 40 An attorney-client relationship exists when a person reasonably believes that the attorney represents the person's legal interests. *Kilpatrick II*, 2001 UT 107 at ¶ 40, 37 P.3d 1130; *see also Bohn v. Cody*, 119 Wash.2d 357, 832 P.2d 71, 75 (1992). In order for a person to "reasonably believe" that an attorney represents the person, (1) the person must subjectively believe the attorney represents him or her and (2) this subjective belief must be reasonable under the circumstances. *Bohn*, 832 P.2d at 75 (citing 1 R. Mallen & J. Smith, *Legal Malpractice* § 8.2 n. 12 (3d ed.1989)); *In re Weiner*, 586 P.2d at 197 (setting forth test for termination of attorney client relationship).

¶ 41 The trial court found both of these elements lacking. Sitting as trier of fact, the trial court concluded that the "attorney-client relationship between Zoll and Castleton ended when Castleton failed to comply with the terms of the August 1995 [delinquency] letter." In addition, the court expressly found that "at the time of the 1996 meeting" with Ricks, Castleton did not (1) "subjectively believe[ ] ... there was an attorney client relationship existing between" him and Zoll, and that (2) even if Castleton had such a subjective belief, it would not have been objectively reasonable. Thus, the trial court found that Castleton had failed to establish either of the elements required for an attorney-client relationship. As shown below, because Castleton

---

8. *Cf. Barry v. Ashley Anderson, P.C.*, 718 F.Supp. 1492, 1494 (D.Colo.1989) (indicating that client's desire that attorney no longer represent client terminates attorney-client relationship notwithstanding attorney's failure to withdraw as counsel of record).

9. Castleton maintains that Utah precedent demands a contrary result. We disagree. One of the cases on which Castleton relies, *Sperry v. Smith*, 694 P.2d 581 (Utah 1984), set forth and applied a former rule regarding withdrawal of counsel. *Id.* at 582–83. However, *Sperry* did not, as Castleton claims, hold that when an attorney has matters before a court and fails to obtain the court's permission to withdraw, the attorney-client relationship remains intact. Indeed, *Sperry* suggests just the opposite: even though a

lawyer ignored the rule's formal requirements for notifying the client of his withdrawal, the *Sperry* court ruled that the lawyer substantially complied with these requirements when he "notif[ied] his clients by letter of his withdrawal and his reasons for doing so." *Id.* at 582.

Castleton also relies on *Lundberg v. Backman*, 11 Utah 2d 330, 358 P.2d 987, 989 (1961), in which we held that, absent an agreement requiring an attorney to pursue an appeal, an attorney need not withdraw from the attorney-client relationship after entry of a final judgment because the relationship generally automatically terminates upon entry of the judgment. *Id.* at 989. In reaching this conclusion we did not, however, hold that an attorney-client relationship could not terminate before entry of a final judgment.

has failed to demonstrate that the trial court clearly erred regarding the first element, we affirm the trial court's conclusion that Zoll and Castleton did not have an attorney-client relationship during Zoll's representation of Ricks.

#### a. Subjective Belief

██ ¶ 42 Whether Castleton subjectively believed that Zoll remained his attorney in the post-divorce matter during the meeting with Ricks presents a question of fact, which we review for clear error. *See, e.g., Teja v. Saran*, 68 Wash.App. 793, 846 P.2d 1375, 1376 (1993) (noting that the issue of whether attorney-client relationship exists generally presents a question of fact). In performing this review, we give due deference to the trial court's opportunity to assess Castleton's credibility regarding his subjective belief. Utah R. Civ. P. 52(a).

¶ 43 We conclude that Castleton has failed to demonstrate that the trial court clearly erred in finding Castleton did not subjectively believe his attorney-client relationship continued through the meeting with Ricks. The trial court had before it ample direct and circumstantial evidence to support its finding, including (1) Zoll's delinquency letter to Castleton, and Castleton's admission that he received it, (2) Castleton's canceled check, the date of which indicated that Castleton failed to tender it to Zoll's firm until after the two-week deadline stated in the delinquency letter, (3) Zoll's and his secretary's testimony that Castleton never made arrangements to pay his bill, (4) Zoll's vague recollection that he and Castleton had an understanding that Zoll would not pursue the objection that he had filed in divorce court, (5) Castleton's admission that Zoll had not performed further legal work for him after filing the objection in February 1995, and (6) the fact that the meeting with Ricks did not occur until fourteen months after the filing of the objection.

¶ 44 Notwithstanding this evidentiary support, Castleton maintains that the court's finding "ignores Castleton's tape recorded plea that Zoll confirm that he was still representing Castleton as Zoll began his inquisition." However, our independent review of the transcript reveals that Castleton did not ask whether Zoll was *still* representing him in the pre-divorce or any other prior legal matter. Instead, he merely asked, "Are you representing me too?" Although this question may indicate that Castleton had some question as to whether Zoll had begun representing him in a new legal matter (i.e., Castleton's theft from Ricks), the question does little to support Castleton's theory that he had a continuing attorney-client relationship with Zoll in the post-divorce matter.[10]

¶ 45 Furthermore, by failing to mention certain evidence in support of the court's finding, Castleton has failed to comply with the marshaling requirement. For instance, while Castleton suggests that his payment of $100 indicates that he believed he complied with the delinquency letter and thereby maintained the attorney-client relationship, he does not mention that the check was dated weeks after the deadline stated in the letter.

¶ 46 Castleton also fails to marshal evidence regarding the April 1996 billing statement. As with the $100 payment, Castleton selectively highlights the evidence favorable to him. In particular, Castleton emphasizes the phrase "professional services" in the billing statement and suggests that this led him to believe that a member of Zoll's staff performed legal work on his behalf in March 1996. However, Castleton fails to mention that the billing statement also specifically indicates that the charges were for runner's fees. Castleton also fails to mention that immediately before the billing statement was admitted into evidence, he testified that in March 1996, Zoll had sent over a runner to Castleton's residence to pick up some materi-

---

10. In his reply brief, Castleton characterizes his question differently. Specifically, rather than claiming that his question indicates that he believed Zoll was still representing him in a former legal matter, he appears to suggest that the question indicates he believed Zoll represented him in the matter at hand with Ricks. We reject as untimely Castleton's apparent attempt to re-characterize the nature of his challenge to the trial court's factual finding. Moreover, in his initial brief, Castleton did not offer a legal argument in support of a theory that Zoll was representing him in the matter with Ricks.

als related to a multi-level marketing organization of which both he and Zoll were members. Based on this testimony, the trial court could reasonably have inferred that Castleton clearly understood that the runner's fees indicated in the billing statement were unrelated to legal work.

¶ 47 Based on the foregoing, and according due deference to the trial court's express finding that Castleton was not a credible witness, we conclude that Castleton has failed to show that the trial court clearly erred in concluding that he did not subjectively believe he had an attorney-client relationship with Zoll at the time of the meeting with Ricks. *See, e.g., Utah Med. Prods. v. Searcy,* 958 P.2d 228, 233 (Utah 1998) ("In light of [appellant's] failure to marshal the evidence, we must assume that all the trial court's findings are supported by the evidence.").[11]

### b. Objective reasonableness

¶ 48 Having affirmed the trial court's finding that Castleton did not subjectively believe Zoll represented him at the meeting with Ricks, we need not consider Castleton's arguments related to the objective reasonableness of his belief.

¶ 49 Accordingly, we reject Castleton's claims dependent on Zoll and Castleton having a continuing attorney-client relationship during the meeting with Ricks.[12]

### B. *Duty of Loyalty Based On The Matters Being Substantially Factually Related*

■ ¶ 50 Castleton next argues that even if Zoll was not representing him at the time Zoll represented Ricks against him, this adverse representation violated the continuing duty of loyalty that Zoll owed to Castleton as a former client. Castleton bases his claim on Rule 1.9(a) of the Utah Rules of Professional Conduct and cases applying this rule. Rule 1.9(a) prohibits a "lawyer who has formerly represented a client in a matter [from] ... [r]epresent[ing] another person in the same or a substantially factually related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation...." Castleton claims that the bankruptcy, collection, and post-divorce matters in which Zoll represented him were "substantially factually related" to the matter in which Zoll represented Ricks against him, and therefore Zoll breached the duty of loyalty he owed Castleton under rule 1.9(a).

¶ 51 Although rule 1.9(a) does not, by itself, provide a civil cause of action, *see Archuleta v. Hughes,* 969 P.2d 409, 413–14 (Utah 1998), we recognized in *Kilpatrick II* that attorneys owe former clients a continuing common law duty of loyalty not to represent an " 'interest adverse to [them] on a matter substantially related to the matter of [the former] engagement.' " 37 P.3d 1130, 2001 UT 107 at ¶ 53 (quoting *Damron v. Herzog,* 67 F.3d 211, 213 (9th Cir.1995)). As explained in *Damron,* the common law imposes such a duty in the belief that the adverse representation presents a "grave risk" that the attorney will use confidential information acquired from a former client to the advantage of the new client. 67 F.3d at 215.

¶ 52 The trial court found that "the matters in which Zoll had represented Castleton; specifically, the Post–Divorce Action, the Bankruptcy Action, and the Collection Case

---

**11.** Though Castleton did mention some evidence favorable to the court's finding, he generally dispersed this evidence throughout his appellate brief. To comply with the marshaling requirement, appellants must marshal *all* the favorable evidence at the point at which they challenge the factual finding. *See Tanner,* 2001 UT 18 at ¶¶ 18–19, 20 P.3d 332; *Fitzgerald v. Critchfield,* 744 P.2d 301, 304 (Utah Ct.App.1987) (concluding appellant's listing of favorable facts in facts section did not meet marshaling requirement).

**12.** Castleton also argues that, even assuming Zoll's attorney-client relationship terminated before the meeting with Ricks, Utah Rule of Professional Conduct 4.3(a) obligated Zoll to treat Castleton as an unrepresented party and to urge him to seek counsel. However, a violation of the rules of professional conduct does not "create any presumption that a legal duty has been breached." Utah Rules of Professional Conduct, Scope. Moreover, Castleton has not cited any cases that have held that an attorney has a legal duty to urge an unrepresented person to seek counsel. Thus we reject this argument as inadequately briefed.

were not substantially factually related to the matter involving Castleton's theft of money from Ricks." Contending that the trial court clearly erred, Castleton notes that the divorce, bankruptcy, and collection matters all "required a thorough understanding of Castleton's assets, liabilities, and income," and that "the principal point at issue in Ricks' claim against Castleton was the extent to which Castleton was indebted to Ricks and the manner in which Castleton could satisfy the debt through a surrender of his personal property."

¶ 53 We conclude that the trial court did not clearly err. Indeed, contrary to Castleton's claim that the matters in which Zoll represented him required a thorough understanding of Castleton's assets, the trial court's findings emphasize the limited scope of Zoll's representation: namely, (1) that as to the post-divorce matter, Zoll entered an appearance in February 1994 in a contempt proceeding and filed an objection to an order prepared by opposing counsel; (2) that as to the bankruptcy matter, Zoll entered an appearance in bankruptcy court in spring 1994 "for the limited purpose of arguing a Motion from an Order of the Bankruptcy Court"; and (3) that in January 1995 Zoll filed an answer for Castleton in the collection matter. Under the circumstances, the trial court could have reasonably concluded that the limited scope of the representation also limited the amount of confidential information Zoll presumptively obtained from Castleton.

¶ 54 In addition, the trial court could have reasonably inferred that the risk that Zoll would rely on confidential information acquired from Castleton diminished with time, especially when the information concerned such relatively time-sensitive matters as "assets, liabilities, and income." Indeed, the trial court specifically noted that the April 8, 1996, meeting with Ricks occurred eight months after the delinquency letter. Even more time had elapsed from the last legal work Zoll performed on Castleton's behalf: the meeting was approximately two years after Zoll's appearances in the post-divorce and bankruptcy matters, and approximately fourteen months after Zoll filed the objection in the post-divorce matter. Moreover, the trial court had evidence before it indicating that Castleton had embezzled significant amounts of money from Ricks. Due to this influx of money, the trial court could have reasonably concluded that Castleton's "assets, liabilities, and income" had changed substantially between the time Zoll represented Castleton and the time Zoll represented Ricks.

¶ 55 In challenging the trial court's finding, Castleton has not marshaled any of this favorable evidence or demonstrated its insufficiency. Thus, we uphold the trial court's factual finding that the matters in which Zoll represented Castleton were not substantially factually related to the matter in which Zoll represented Ricks against Castleton. *See, e.g., Utah Med. Prods.*, 958 P.2d at 233 ("In light of [appellant's] failure to marshal the evidence, we must assume that all the trial court's findings are supported by the evidence."); *see also Tanner*, 2001 UT 18 at ¶ 17, 20 P.3d 332. Accordingly, we reject Castleton's claim that Zoll's representation of Ricks violated Zoll's continuing duty of loyalty to Castleton.

## II. PROXIMATE CAUSE

¶ 56 Having concluded that the trial court correctly determined that Zoll did not violate a duty of loyalty arising from either a current or former attorney-client relationship, we need not consider Castleton's arguments with respect to the proximate cause element of the malpractice cause of action.

## CONCLUSION

¶ 57 We affirm the trial court's judgment in favor of Zoll based on its determinations related to the duty element of the legal malpractice cause of action.

¶ 58 Regarding Castleton's first claim, we conclude that the trial court did not clearly err in finding that Castleton did not subjectively believe that Zoll was still his attorney at the time Zoll facilitated the seizure of Castleton's property. Since this finding means that their attorney-client relationship had ended, we affirm the trial court's conclusion that Zoll did not owe Castleton the

common law duty of undivided loyalty that a lawyer owes a current client.

¶ 59 Regarding Castleton's second claim, we affirm the trial court's conclusion that Zoll's representation of Ricks did not implicate Zoll's continuing duty of loyalty to Castleton, since the trial court did not clearly err in finding the matter in which Zoll represented Ricks was not substantially factually related to the matters in which Zoll had previously represented Castleton.

¶ 60 Chief Justice DURHAM, Justice HOWE, Justice RUSSON, and Justice WILKINS concur in Associate Chief Justice DURRANT's opinion.